Tried July 10–12, defendant disbarred October 3, 1922.

## STATE EX REL. MONTGOMERY *v.* ESTES.

(209 Pac. 486.)

**Attorney and Client—Misconduct Justifying Disbarment not Limited to Acts Committed in a Professional Character.**

1. The misconduct under which Section 1091, Or. L., will disbar is not limited to acts committed strictly in a professional character, but extends to all such misconduct as would have prevented an admission to the bar.

**Attorney and Client—Misconduct of Attorney must be Clearly Established to Warrant Disbarment.**

2. A disbarment proceeding is a civil and not a criminal proceeding, and yet a mere preponderance of the evidence is not sufficient to warrant disbarment or suspension, but the guilt of the attorney must be clearly established.

**Attorney and Client—Evidence Held to Show Misconduct in Handling Estate.**

3. In disbarment proceedings under Section 1096, Or. L., evidence *held* to show that defendant was guilty of misconduct in handling an estate and litigation for a blind, aged and feeble old woman.

---

1. Causes and proceedings for the disbarment of attorneys, and the power of courts to disbar, see notes in 95 **Am. Dec.** 333; 45 **Am. St. Rep.** 71; Ann. Cas. 1917B, 232.

**Attorney and Client—Evidence Held to Show Misconduct in Handling Litigation.**

4. In a disbarment proceeding under Section 1096, Or. L., evidence *held* to show misconduct on part of attorney in handling litigation, collecting judgment, and failing to give the client his share.

**Attorney and Client—Evidence Held Insufficient to Show Misconduct in Handling Bankruptcy Proceeding.**

5. In disbarment proceeding under Section 1096, Or. L., evidence *held* insufficient to show that attorney converted to his own use money which was given him to institute bankruptcy proceedings.

**Attorney and Client—Evidence Held Insufficient to Show That Attorney Permitted Taxes to Become Delinquent.**

6. In a disbarment proceeding under Section 1096, Or. L., evidence *held* insufficient to show that attorney permitted taxes for which the client had given him money and requested him to pay to become delinquent.

**Attorney and Client—Evidence Held to Show Misconduct in Obtaining Loan.**

7. In a disbarment proceeding under Section 1096, Or. L., evidence *held* to show that attorney was guilty of misconduct in obtaining a loan by false representations that he owned an interest in a certain building, and that a certain corporation was indebted to him in the sum of $25,000.

**Attorney and Client—Evidence Held Insufficient to Show Fraudulent Writing of Assignment on Stock Certificates.**

8. In a disbarment proceeding under Section 1096, Or. L., evidence *held* insufficient to show that attorney fraudulently wrote an assignment on the back of stock certificates which were given as collateral security for a loan.

Original proceeding for disbarment.

DEFENDANT DISBARRED.

For plaintiffs, *Mr. Bradley A. Ewers* and *Mr. Robert F. Maguire.*

For defendant, *Mr. B. F. Mulkey, Mr. E. L. Fraley* and *Mr. D. D. Hail.*

PER CURIAM.—The Multnomah Bar Association is an organization composed of attorneys at law who reside in Multnomah County and have been admitted to practice law in the courts of this state. Hugh S. Montgomery, Albert B. Ridgway, Bert E. Haney, Rob-

ert F. Maguire, Homer D. Angell, and John K. Kollock are the members of the grievance committee of the association; and Clarence H. Gilbert, Clarence J. Young and J. F. Boothe constitute the board of chancellors of the association. Under the rules of the organization it is the duty of the chancellors and the grievance committee, if they find reasonable grounds to believe an attorney at law guilty of conduct meriting disbarment, to initiate a disbarment proceeding against such attorney.

The persons composing the grievance committee and the board of chancellors of the Multnomah Bar Association caused to be filed in this court on June 7, 1922, pursuant to Section 1096, Or. L., an accusation containing six charges against George Estes, a member of the bar of this state. The accused denied all the charges. The trial was conducted in the presence of all the members of this court sitting in banc, and therefore the court had the benefit of seeing and hearing all the witnesses testify, except the witness J. H. Hobart whose testimony was taken on written interrogatories.

Section 1091, Or. L., is given the following heading in the present Code: "An Attorney may be Disbarred for Unprofessional Conduct." This section was enacted in 1901, Laws 1901, p. 67, and was entitled: "An Act to Regulate Disbarment Proceedings"; and the body of the act read as follows:

"Section 1. Any member of the bar of this state shall be disbarred by the Supreme Court, upon proper proceedings for that purpose, whenever it shall be made to appear to that court that if he were then applying for admission to the bar his application should be denied because of unprofessional conduct."

The statute was codified as Section 1066 in Bellinger & Cotton's Annotated Codes and Statutes of Ore-

gon, and was there given the above-quoted heading. The statute appears with the same heading in Lord's Oregon Laws, as Section 1091. This court in an opinion rendered in *Ex parte Tanner,* 49 Or. 31 (88 Pac. 301), stated that the interpretation of the language of the act was involved in doubt, but suggested that the statute probably meant

"that an attorney shall be disbarred when it appears that his general moral character or unfitness is such that, if he were applying for admission, his application would be denied."

The statute was amended in 1915 so as to read as follows:

"Any member of the bar of this state shall be disbarred by the Supreme Court, upon proper proceedings for that purpose, whenever it shall appear to that court that his conduct has been such that if he were then applying for admission to the bar his application should be denied." Chapter 259, Laws 1915; Section 1091, Or. L.

It is plain that the heading given to the section in its original form in the Bellinger and Cotton and in the Lord compilations is not an appropriate heading for the statute in its amended and present form. Under the law as it now is any member of the bar of this state "shall be disbarred" whenever it shall appear that his conduct has been such that "if he were then applying for admission to the bar his application should be denied." It is provided by Section 1077, subdivision 2, Or. L., that an applicant for admission must show that he is a person of good moral character. This court has said:

"The immorality that rejects an applicant is ground upon which to disbar." *In re Crum,* 103 Or. 296 (204 Pac. 948.) We quote from 6 C. J. 584:

"As good character is an essential qualification for the admission of an attorney to practice, he may be removed whenever he ceases to possess such a character."

1. The misconduct which under our statute will disbar "is not limited to acts committed strictly in a professional character, but extends to all such misconduct as would have prevented an admission to the bar." *In re O——*, 73 Wis. 602 (42 N. W. 221). The words "good moral character" include "all the elements essential to make up such a character. Among these are common honesty and veracity, especially in all professional intercourse." *In re O——*, 73 Wis. 602 (42 N. W. 221); *In re Crum,* 103 Or. 296 (204 Pac. 948); 1 Thornton on Attorneys at Law, § 62; 6 C. J. 573.

2. A disbarment proceeding is a civil and not a criminal proceeding, and yet a mere preponderance of the evidence is not sufficient to warrant disbarment or suspension. The guilt of the attorney must be clearly established: *In re Crum,* 103 Or. 296 (204 Pac. 948); *Ex parte Kindt,* 32 Or. 434 (52 Pac. 187). The imposition of punishment for the commission of criminal offenses is provided for by other proceedings authorized for that purpose, but a disbarment proceeding is entertained as "necessary for the protection of the court, the proper administration of justice, and the dignity and purity of the profession, and for the public good and the protection of clients." *Ex parte Finn,* 32 Or. 519 (52 Pac. 756, 67 Am. St. Rep. 550); *Ex parte Tanner,* 49 Or. 31 (88 Pac. 301). As was said in *Attorney's License,* 21 N. J. Law, 346, the power to reject an applicant for admission or to disbar an attorney already admitted

"is one of great delicacy, and should be exercised with extreme caution, and with scrupulous regard for the character and rights of the applicant. But on the other hand, the standing of the profession must not be disregarded, nor must the court shrink from the performance of a clear duty however embarrassing."

The ultimate purpose of a disbarment proceeding is

"to ascertain whether the accused is worthy of confidence and possessed of that good moral character which is a condition precedent to the privilege of practicing law and of continuing in the practice thereof." *In re Thresher*, 33 Mont. 441 (84 Pac. 786, 114 Am. St. Rep. 834, 18 Ann. Cas. 845).

For convenience the six charges may be designated respectively as the Willoughby, Hansen, Schrump, Baird, Meyers and the Roberts charge.

## THE WILLOUGHBY CHARGE.

3. The accusation alleges that prior to November 24, 1916, George Estes was employed as an attorney by John Willoughby and Anna Willoughby to negotiate a loan to Julia Kerslake on certain real property in Multnomah County; that on about November 24, 1916, the defendant as such attorney in behalf of John and Anna Willoughby loaned $500 to Julia Kerslake and took her note for that amount secured by a mortgage on the land, and that on April 11, 1917, as such attorney for John and Anna Willoughby he loaned an additional sum of $500 to Julia Kerslake and received her note secured by a mortgage on the real property; that on February 25, 1920, the amounts due on the notes were paid to George Estes as the attorney in fact for Anna Willoughby and as such attorney in fact he executed a release of the mortgages; that George Estes willfully converted the money to his own use and has not accounted for any

of it except on about May 15, 1922, and after he had
been tried before the grievance committee and chan-
cellors of the Multnomah Bar Association, he paid
$500 to the Security Savings & Trust Company of
Portland. It is also averred in the accusation that
the defendant was employed by Anna Willoughby to
act as attorney in the estate of John Willoughby, de-
ceased, which was being administered in the probate
department of the Circuit Court for Multnomah
County and, knowing that Anna Willoughby "is a
blind, aged and feeble old woman," the defendant ob-
tained from her a power of attorney to represent
her; that soon after giving the power of attorney
Anna Willoughby learned that the defendant had
drawn funds out of her bank account and the funds
belonging to said estate; that thereupon on March 10,
1919, she revoked Estes' power of attorney and made
a declaration of trust with the Security Savings &
Trust Company which provided for the handling of
her entire estate and all matters by the Trust Com-
pany; that notice of such declaration of trust and of
the revocation of the power of attorney was immedi-
ately conveyed to the defendant, and a demand was
made upon him by the Trust Company for an account-
ing of all moneys collected and disposed of for Anna
Willoughby individually or for the estate of John
Willoughby, deceased; that the defendant misappro-
priated the moneys of Anna Willoughby and of said
estate and has refused to account for the money col-
lected by him and drawn from the bank.

John and Anna Willoughby were husband and wife,
and he owned and drove a taxicab. John Willoughby
died November 7, 1918. On November 15, 1918, Anna
Willoughby gave to George Estes a general power of
attorney. Under date of December 27, 1918, Anna

Willoughby revoked the power of attorney which she had given to Estes. On March 10, 1919, Anna Willoughby as trustor executed a declaration of trust to the Security Savings & Trust Company of Portland as trustee. It is admitted that in behalf of John and Anna Willoughby the defendant loaned $500 to Julia Kerslake on November 24, 1916, and that he loaned a like amount to her on April 11, 1917. It is also admitted that Julia Kerslake paid the notes representing the loans and that Estes received the money and satisfied the mortgages given as security for the notes. The accusation charges that Estes converted the money to his own use. The defendant says that he has accounted for the money and that Anna Willoughby is indebted to him.

Estes acted as attorney for John and Anna Willoughby through a period of several years beginning with 1915, and during that period he received from the Willoughbys and from other persons for the Willoughbys moneys aggregating several thousand dollars; and during the same period he disbursed several thousand dollars. At the trial it was said by Estes that Anna Willoughby is the sole heir of John Willoughby; and hence no attempt is made to ascertain the amount of money received or disbursed in behalf of John Willoughby or his estate as distinguished from moneys received or disbursed in behalf of Anna Willoughby alone. At the trial which was begun on July 10th and concluded on July 12, 1922, a detailed statement of account designated "Willoughby bill of particulars" was received in evidence; and this bill of particulars purports to be a detailed statement showing the transactions beginning with 1915. We do not in this proceeding attempt to pass upon the propriety or reasonableness of any of the items

making up this bill of particulars. We assume throughout this proceeding that the statement is an accurate account so far as it relates to moneys received and expended. Nor do we attempt to pass upon the propriety or reasonableness of the charges made for legal services. Most of the fees charged for legal services were either approved by either both or one of the Willoughbys and the fees so approved are not subject to re-examination, but possibly a portion of the fees charged are controverted by Anna Willoughby, and so we do not attempt in this proceeding to ascertain whether these possibly controverted items are proper or reasonable; but without attempting to decide the question of the propriety or reasonableness of such charges we shall treat them as correct items. According to the bill of particulars the defendant received from the Willoughbys directly or from other persons for them the total sum of $12,784.10, and the disbursements made for the Willoughbys together with attorney's fees charged against them aggregate $13,294.86, leaving a balance of $510.76 alleged to be due Estes at the time of the trial.

According to the testimony of the attorney for the Trust Company the Kerslake mortgages were satisfied of record November 25, 1920, by George Estes as attorney in fact for Anna Willoughby, notwithstanding the power of attorney had been revoked December 27, 1918. Estes claimed that he did not know of the revocation of the power of attorney until about one month before the trial. According to the bill of particulars submitted by Estes, $217 was paid on the principal of one of the Kerslake notes on October 10, 1917, and the balance due on such note as well as the whole of the principal due on the other Kerslake note,

or a total of $783, with interest, was paid to Estes on
April 10, 1918.  In short, Estes received all the money
due on the Kerslake notes before the death of John
Willoughby and prior to both the execution of the
power of attorney and the revocation.

Possibly before and certainly about the time of the
execution of the declaration of trust dated March 10,
1919, the trustee made a demand upon Estes for an
accounting.  The defendant delayed and postponed
the preparation and submission of a statement of the
account.  The record contains a statement dated Jan-
uary 2, 1920, and one dated December 31, 1920.  The
first of these two statements purports to cover a
period beginning with May 10, 1917, and ending with
January 1, 1920, showing a balance of $299.85 due
Anna Willoughby.  The second statement purports to
cover a period beginning with May 10, 1917, and end-
ing December 30, 1920, with a balance of $74.75 due
George Estes.  Neither one of these two statements
mentioned the payments made on the Kerslake notes
on October 10, 1917, and April 10, 1918.  According
to the bill of particulars Estes paid Anna Willoughby
$900 in installments of $100 each between April 1,
1919, and November 10, 1919, and in May, 1922, he
paid $500.  If the defendant had rendered a complete
statement of the account within a reasonable time
after the demand for an accounting, it would have
shown a considerable balance in favor of Anna Wil-
loughby; but instead of rendering a statement with
reasonable promptness the defendant delayed and.
procrastinated and at the end of the year rendered an
incomplete statement, and still a year later sub-
mitted another incomplete statement.  The payment
of the nine installments between April 1, 1919, and
November 10, 1919, together with $500 paid by him in

May, 1922, enabled the defendant to present a bill of particulars in July, 1922, showing a balance in his favor, if it be assumed that every item in the bill of particulars should be allowed. The facts compel us to conclude that the defendant was guilty of misconduct: *In re O* ——, 73 Wis. 602 (42 N. W. 221).

### THE HANSEN CHARGE.

4. It is averred in the accusation that prior to August 1, 1921, H. M. Hansen employed the defendant to act as his attorney in an action against W. H. Wallingford Co., which terminated in the Circuit Court for Multnomah County in a judgment against W. H. Wallingford Co. for $3,256 and costs and disbursements; that thereafter the company was adjudged a bankrupt; that between August 1, 1921, and February 26, 1922, the defendant received from the bankrupt estate $1,110.57 as part payment of the judgment; that the defendant misappropriated and converted to his own use $416.35 of the moneys so paid to him; and that the defendant after collecting the $1,110.57 did not advise Hansen of such collection and Hansen was obliged to employ an attorney to compel the defendant to account for said sum of money.

The defendant received from R. L. Sabin trustee for the W. H. Wallingford Co., on August 1, 1921, $326.64; September 3, 1921, $653.28; February 28, 1922, $130.65; making a total of $1,110.57. The defendant claims that when he was employed to sue the W. H. Wallingford Co. he took the case upon a contingent fee basis and that it was agreed that he was to receive 50 per cent of the amount recovered if the full amount sued for was recovered, or if less was recovered he was to have the first 30 per cent collected. A judgment for $3,266.49 was obtained against the W. H. Wallingford Co. and 30 per cent of that

sum is $974.94. Hansen claims that the defendant stated that if Hansen paid the filing fees the defendant would take the case on a contingent fee basis, but that nothing was said or agreed upon about the amount of the fee. Hansen testified that after September 2, 1921, he made inquiry of the defendant and that the latter said he did not have any money. Hansen also testified that on March 14, 1922, he discovered that the defendant had received $653.28 and $130.65 which Estes had not accounted for, and that he went to the office of the defendant and asked him about it, and that the defendant drew a long sigh and said that he had been sick and not able to get to it. Hansen claims that he made his first demand after March 21, 1921, and that he repeated the demand about once every two weeks. Hansen finally employed another attorney, Charles E. Lenon, to attend to the matter for him; and on April 4, 1922, Lenon interviewed the defendant. The outcome of the interview was a writing signed by Hansen and the defendant. By the terms of this writing it was agreed that of the $1,110.57 collected by the defendant he was entitled to 40 per cent amounting to $444.22 and that "there belonged to H. M. Hansen the sum of $666.35 of which the sum of $250 has been paid to H. M. Hansen, leaving a balance due H. M. Hansen in the sum of $416.35." In the record is a paper labeled "voucher check" showing that Hansen was paid $200 "on account" on September 6, 1921, and a similar paper purporting to show that on March 16, 1922, Hansen received $50 as "payment on account." Each of these papers is indorsed on the back by H. M. Hansen.

Lenon testified that when the written agreement was made he asked the defendant when he could make payment and the latter said he would have the

money to-morrow or at least the next day. Lenon says that he kept going to the defendant's office every day until finally on April 13, 1922, he got a check for $30. No other payments have been made since that time. The defendant had been notified to appear before the grievance committee of the Multnomah Bar Association. Lenon says that he called the defendant on the telephone the evening before the latter appeared before the grievance committee and asked him if he could make payment on the account and that the defendant thereupon said in substance: "Now, it will depend upon what you say to the grievance committee whether you get any money or not on that claim." Subsequently and after the defendant appeared before the grievance committee of the Multnomah Bar Association, the defendant sued Hanson for an alleged breach of the agreement by filing a complaint verified May 4, 1922. The defendant denies that he had the telephone conversation concerning which Lenon testified.

The defendant says that he prepared and mailed under date of September 6, 1921, a statement showing that he was entitled to $979.20 as being 30 per cent of the judgment against W. H. Wallingford Co., that he had collected $326.64 on August 1, 1921, and $653.28 on September 5, 1921, and that he had paid Hansen $200 on September 6, 1921. A carbon copy of the alleged statement is in evidence and purports to show that it was addressed to Hansen at 7312—54 Avenue S. E. Portland, Oregon, as his home address. Hansen says that he never received the statement and that he never lived at the address mentioned. Posted on the file envelope or cover used by the defendant is the business card of Hansen. This card indicates that Hansen was a representative of the Gill Piston

Ring Co. at 409 Burnside Street. On this card is stamped with the defendant's rubber stamp "Sep. 6–1921."

On March 23, 1922, Hansen addressed a letter to the defendant saying:

"I called at your office today according to appointment, but could not see you. I do not propose to be put off in this way. You have my money, and I hereby demand payment before Saturday noon, March 25, 1922."

The next day the defendant mailed to Hansen a letter saying, among other things:

"You state that you called at my office today, (March 23) according to appointment and could not see me. You had no appointment with me on March 23. You called at my office on Monday and I told you that I would get around to your statement and business affairs with this office by the end of the week. * * I will prepare and mail you a statement of all business transactions in this office on your behalf which you will receive about the middle of the coming week. If you do not care to wait that long, you may resort to any means that pleases you."

The defendant failed to render a statement. Notwithstanding the defendant contends that it was agreed when he was employed to sue the W. H. Walingford Co., he was to receive 50 per cent if the full amount was recovered and 30 per cent if less than the full amount was recovered, and notwithstanding the payment of $200 and $50 "on account" to Hansen, the defendant claims that he signed the writing of April 6, 1922, in order to settle the matter and that he made the $200 and $50 payments merely as a concession. We are not impressed with the explanation offered by the defendant. The evidence constrains us

to conclude that the defendant failed in his duty to his client.

## THE SCHRUMP CHARGE.

5. It is averred that on December 1, 1921, F. D. Schrump employed George Estes to carry through for him a bankruptcy proceeding in the United States District Court for the District of Oregon upon an agreed fee of $145, which sum was to include the filing fees in the bankruptcy court and attorney fees in full; that Schrump signed all the papers and schedules requested by defendant and that the defendant told Schrump that the petition for bankruptcy would be filed forthwith; that on numerous occasions Schrump called upon the defendant and asked him how the bankruptcy proceeding was progressing and on each occasion the defendant said that the petition had been filed and that Schrump had nothing to worry about; that on February 1, 1922, Schrump examined the records of the United States District Court for the District of Oregon and ascertained that the petition had not been filed; that Schrump demanded of the defendant the return of the sum of $145; that the defendant willfully misappropriated and converted the $145 to his own use and has never accounted to Schrump for any part of the money.

The defendant was employed by F. D. Schrump to act as his attorney in conducting a voluntary bankruptcy proceeding. Schrump claims that the defendant advised him to file a voluntary petition in bankruptcy so as to protect against then existing indebtedness any property he might inherit in the future; but the defendant asserts that he advised against filing the petition. However, it is conceded by all that it was agreed that the defendant would attend to the bankruptcy proceeding for $145 and out of that

sum pay the filing and other fees ordinarily required in such a proceeding. Printed blanks were used. A petition with attached schedules was filled out and signed early in December, 1921, but it appears that through an oversight Schrump did not sign the oaths to the schedules. It seems that the defendant's office manager was assigned the duty of looking after the signing of the papers. Schrump left the office supposing that the papers had been properly signed. After his departure the office manager discovered the oversight and she at once left word at Schrump's home for him to come to the office and sign. Estes says that he supposed that the papers had been signed. A few weeks afterwards Schrump met the defendant and asked him how the bankruptcy proceeding was progressing; and the defendant told him that everything was all right and that it was going along in good shape. The defendant says that he assumed that the office manager had filed the papers and that she was attending to the matter in accordance with the practice followed in his office, and that he did not know that the papers had not been filed on account of the failure to require Schrump to sign the oaths. Several weeks after Schrump had signed the petition and schedules he went to the clerk's office and ascertained that no papers had been filed and thereupon he went to the defendant's office, told the defendant of what he had learned, directed the defendant not to file the papers, and notified the defendant that he did not want the defendant to represent him any longer. Schrump claims that at that time he said nothing about the money which he asserts that he had paid to the defendant, but a few weeks afterwards he went to the defendant's office and demanded the money; that the defendant told him to come in the

following Monday; that he called at the time designated and found that the defendant was out but had left a letter dated April 8, 1922, addressed to Schrump and informing the latter that nothing was due him from the defendant. Subsequently Schrump presented the matter to the grievance committee of the Multnomah Bar Association.

It appears that a judgment amounting, with interest, attorney's fees and costs, to more than $3,000 had been obtained against R. E. Bondurant and others, that Schrump claimed an interest in the judgment, and that the defendant claimed and had filed a lien upon the judgment for his attorney's fees. Under date of June 13, 1921, an agreement was signed by the defendant, Schrump and others, whereby Schrump agreed that there was due the defendant as attorney's fees, the sum of $790.85 and that the defendant "has lien on the said judgment for said amount as a balance due him * * *" On August 2, 1921, $500 was paid to the defendant on the Bondurant judgment, and on October 26th, following, $300 was received by the defendant on that judgment.

It appears that an agreement was made whereby the Bondurant judgment was to be settled for less than the face of the judgment, and Schrump insists that as a part of the settlement the defendant agreed to accept $400 in full for his attorney's fees, and that payment was effected by the defendant retaining $250 due on the first Bondurant payment and $150 due on the second Bondurant payment. The defendant contends that he had a lien on the collections made by him but at the earnest request of Schrump and as a mere favor he handed over to Schrump $200 on the first collection and that after the second Bondurant payment and at the earnest request of Schrump he

made out a check for Schrump for a portion of that payment.

Schrump testified that in November, 1921, he called at the defendant's office to see about some money due him. We understand that the money to which the witness referred was the second Bondurant payment. A check was made out for Schrump for $125 but he says that the check was a few dollars short of the amount due. On this occasion the bankruptcy matter was discussed and the defendant agreed to attend to the proceeding for $145. Schrump says that he told the defendant to keep the check and that he would get the difference and pay it to the defendant. The defendant admits that Schrump "turned the check back and asked him to put him through bankruptcy." The office manager, under date of December 1, 1921, or probably when the petition and schedules were signed, gave to Schrump a receipt for $145 "being settlement in full for costs, disbursements and attorney's fees in bankruptcy proceeding." The defendant testified that Schrump paid no money on this receipt and, subject to qualification, this is an accurate statement; because Schrump did not "get the difference" until January 9, 1922, when he appears to have paid $16.25 and received a receipt which was signed by the office manager and contains the following recital:

"To make up deficit in the amount due this office under receipt given him Dec. 1, 1921, for $145.00 as settlement for costs, disbursements and attorney's fees in his bankruptcy proceedings."

The defendant claims to have rendered a statement which he says is now an account stated. This statement charges the defendant with $790.85 as attorney's fees in the Bondurant case, $145 as the charge in the bankruptcy proceeding, and other items, amounting in

all to $1,053.15.    Schrump is credited with $250 out
of the first Bondurant collection and with $300 the
second Bondurant collection and with other items,
totaling $588.75.    The balance shown and claimed by
the defendant to be due him is $464.40.

It is plain that the defendant did not deliberately
refrain from filing the bankruptcy papers in order to
appropriate the $145.    The failure to file the papers
resulted from the oversight in not having Schrump
sign the oaths.    The defendant naturally supposed the
papers had been filed and we do not think that he
knew that the papers had not been filed until so in-
formed by Schrump after Schrump had gone to the
clerk's office.    The defendant is not charged with neg-
ligence because of the failure to file the papers but
he is charged with misappropriating and converting
$145 to his own use.    If the defendant agreed to ac-
cept $400 in full for his attorney's fee in the Bondu-
rant case he ought to have paid the $145 to Schrump
when Schrump demanded the money.    The evidence
affords ample room for controversy as to whether or
not the defendant agreed to accept $400 in full pay-
ment.    If, however, the defendant did not so agree
the case is different.    The evidence does not show
that the defendant converted the $145 to his own use.

## THE BAIRD CHARGE.

6. It is averred in the accusation that during the
month of December, 1917, Ricey A. Baird employed
the defendant to act as her attorney and represent
her in the payment of taxes which had accumulated
for the years 1913 to 1916 upon certain real property
in Klamath County described in a mortgage "between
Emma G. Robinson, unmarried, and R. A. Baird,"
dated, March 31, 1914; that in December, 1917, Ricey
A. Baird delivered to the defendant $251.37 to be in

full payment for the taxes upon the property described in said mortgage; that the defendant did not pay the taxes but permitted the taxes to become delinquent with the result that the property was sold for delinquent taxes and thereafter W. C. Foster as plaintiff brought a proceeding against Emma G. Robinson to foreclose the tax lien and that the proceeding terminated in a judgment and decree and thereafter on June 21, 1919, a deed was made pursuant to the decree of the court; that the sheriff of Klamath County executed and delivered to W. C. Foster a deed for the property; that the defendant willfully misappropriated and converted the sum of $251.37 to his own use and has never accounted for said money.

In 1914 Emma G. Robinson, to secure a note for $2,800, gave to Ricey A. Baird a mortgage on a section of land in Klamath County. The defendant admits that in December, 1917, and in January, 1918, Ricey A. Baird deposited with him $603.06 for the payment of taxes on lands in Harney, Lake and Klamath Counties. The taxes on the Lake and Harney County lands appear to have been paid, leaving $251.37 to be applied on the Klamath County lands. Emma G. Robinson had not paid all the taxes due on the land covered by her mortgage. The defendant says that he wrote to the sheriff of Klamath County inquiring as to the amount of taxes due on the mortgaged land and stating that he was in a position to pay the taxes, but that the sheriff answered by stating that a large area, including the mortgaged premises, was in litigation and that he could not accept any money for taxes until the litigation was settled. The defendant says that he sent for an abstract of record relative to the title, and that on October 22, 1919, he received the abstract and also a letter from

the sheriff advising him that the taxes could be paid. The defendant says that Mrs. Baird wanted to ascertain the value of the land before redeeming the land from delinquent taxes. After securing information concerning the value of the land Mrs. Baird told the defendant, so he says, to proceed with the foreclosure of the mortgage. The defendant says that he then for the first time learned that the land had been sold to W. C. Foster by the sheriff pursuant to a proceeding to foreclose delinquent tax liens. The sheriff's sale was made on May 24, 1919, and the sheriff executed a deed in the following June. The defendant says that he told Mrs. Baird that the only thing to do was to buy Foster's interest. In the meantime the defendant had written to the county clerk of Klamath County for a transcript of the tax foreclosure proceedings, and upon the arrival of the transcript the defendant discovered an irregularity which he says renders the tax foreclosure proceeding void. Regardless of the validity of the tax foreclosure proceeding the defendant paid $200 to the W. C. Foster Company as a part of the total payment of $611 to be paid for a deed "from the present title holder of" the Klamath County land. The defendant says that he subsequently got a deed from Foster and turned it over to Mrs. Baird. The defendant also says that the understanding was that he "go ahead with the foreclosure of the mortgage." Mrs. Baird was killed July 28, 1920, and an administrator of her estate was appointed. Prior to her death the defendant began a suit to foreclose the mortgage. The defendant claims that he turned over the correspondence to Mrs. Baird and that she "was cognizant of every movement all the time." The defendant says that he did a great deal of work for Mrs. Baird, including several cases,

and that she never paid him anything except for services rendered in a divorce suit, and so he filed with the administrator of the Baird estate a claim for about $1,176 alleged to be due him. The evidence given in support of the Baird charge is not, as we view it, sufficient to sustain the charge.

### THE MEYERS CHARGE.

7. It is alleged in the accusation that prior to April 30, 1920, the defendant applied to Mrs. Lucille Meyers for the loan of $3,000 and promised to give high class security for the loan; that the defendant represented to Mrs. Meyers that he could give her a mortgage upon an interest which he owned in the Lumbermen's Building in Portland or upon a certain concrete building which was a warehouse on the east side of Portland or make an assignment of an attorney's fee to which he was entitled from the Gibson Mining Syndicate representing that he had $25,000 coming to him from the syndicate; that Mrs. Meyers told the defendant that the money held by her was being held as trustee for her father and mother and that she "had to be very careful about making the loan"; that on April 30, 1920, Mrs. Meyers loaned $3,000 to the defendant for which he gave his promissory note payable sixty days after date, and he secured the note by an assignment of attorney's fees alleged to be due from the Gibson Mining Syndicate; that the defendant made oath before a notary public "in the said assignment that the said sum of money was due him for work performed"; that thereafter Mrs. Meyers learned that the defendant did not have any sum of money coming to him from the Gibson Mining Syndicate but that the syndicate had a contract with him whereby the maximum amount of his attorney's fee had been fixed and that the syndicate had already

paid the defendant more than the maximum amount
provided for; that the defendant knew that his repre-
sentations concerning the attorney's fee were false
and untrue and that he made such representations for
the purpose of defrauding Mrs. Meyers out of the
sum of $3,000, and that Mrs. Meyers relied upon the
representations when making the loan.

The defendant borrowed $3,000 from Mrs. Lucille
Gillette, now Meyers, and under date of April 30,
1920, gave to her his promissory note for $3,000 pay-
able sixty days after date with interest at 8 per cent
per annum, the interest payable at the maturity of
the note.   Mrs. Meyers says that she told the defend-
ant that the money belonged to her parents, and in
this respect she is corroborated by Earl Riley.   It is
claimed by Mrs. Meyers that she learned that the de-
fendant wanted to borrow $3,000 and that she inter-
viewed the defendant at his office with reference to
the matter.   She says that the defendant told her that
he could secure the loan by a concrete building, or by
an interest owned by him in the Lumbermen's Build-
ing, which interest he says amounted to more than
$3,000, or by an attorney's fee due him from the Gib-
son Mining Syndicates.   The truth is that the defend-
ant did not own any interest in the Lumbermen's
Building.   The defendant, as a witness, attempted to
explain his representations concerning the Lumber-
men's Building by saying that he told Mrs. Meyers
that he was negotiating with a number of his friends
who proposed to take over the building.   But the fact
remains that he had no interest in the building and
yet was talking about securing the loan with some-
thing he did not have.   The talk about the Lumber-
men's Building is instructive because it tends to
reveal the attitude of the defendant during the transac-

tion. The defendant, under date of April 10, 1920, prepared and signed a written statement in which he represented that—

"The contract between the Gibson Mining Syndicates and Geo. Estes, Attorney at Law, for legal services, embraces advice, counsel, and legal work necessary * * for the purpose of protecting the interests of the Portland and Spokane Syndicates of stockholders in the Gibson Mining Company, Inc. * *

"These mining claims are extremely valuable and the professional services being performed by me involve a large amount of legal counsel and advice, together with many lawsuits and legal proceedings of different kinds pursued in Oregon, Washington and the Province of British Columbia * * .

"Under the terms of the contract between myself and the syndicates, there is due, or to become due to Mr. Estes, sums of money greatly in excess of the amount assigned herein for legal services and expenses not yet computed in behalf of the syndicates of stockholders as aforesaid."

Attached to the statement and dated April 30, 1920, is a written assignment to Mrs. Meyers of his claim against the Gibson Mining Syndicate for attorney's services and legal expenses. The assignment was "given as collateral security" for the note made on that date. Attached to the statement and assignment is an affidavit in which the defendant swore that the statement

"of attorney's services and legal expenses due me from the Gibson Mining Syndicate, composed of the gentlemen named in said statement are true and that the said sums of money so set out in said statement are now due and payable to me under my contract with them, and that the same is a good and subsisting obligation in every respect."

The truth is that about August 8, 1919, the defendant was employed by the Portland Syndicate of the

Gibson Mining Company to protect the interests of the stockholders and those holding claims against the Mays and the Gibson Mining Company, Ltd. After loaning the money Mrs. Meyers learned that the Portland Syndicate claimed that nothing was due the defendant. The syndicate contended and still contends that the contract of employment made with the defendant provided that $2,500 was to be paid to the defendant and out of that sum he was to pay $500 to Vancouver attorneys and a like sum to Spokane attorneys, and that the defendant was to have his traveling expenses and be reimbursed for filing fees but that no other moneys were to be paid him. The syndicate also claimed and still claims that "the estimate of the probable cost of expenses and fees has been placed by Mr. Estes at $4,000 and not to exceed in any event the sum of $5,000 for the entire total cost." The syndicate insists that at no time after the employment of the defendant was more than $2,500 due him and that on April 10, 1920, no money was due the defendant from the syndicate.

The defendant has sued J. C. Roberts for $2,500 and he has sued the syndicate for $25,000 for services alleged to have been performed. If the truth is as claimed by the syndicate nothing was due the defendant when he borrowed the money from Mrs. Meyers and in that event his representations to her were false. If the defendant was to receive $2,500 as a retainer and in addition was to be paid the reasonable value of his services, nevertheless the defendant knew at the very time he borrowed the money that the amount of the additional fees, if any, which he would ultimately receive was problematical and speculative. The defendant was not frank and straightforward in his dealing with Mrs. Meyers. The circumstances did

not warrant him in representing to Mrs. Meyers that the assignment was ample security for $3,000. The defendant may possibly at some time in the future and at the end of a lawsuit recover a judgment against the syndicate, and yet that possible future occurrence can offer but little justification for the representations made by the defendant on April 10, and on April 30, 1920. The defendant has paid six installments of interest amounting to $20 each. Three installments were paid August 21, 1920, one on August 20, one on September 20, and the sixth on October 30, 1920. No other payments have been made on either the principal or interest. When sued for the amount of the note the defendant claimed that Mrs. Meyers, who it is said is the sole heir of her parents, as guardian to her mother owed him $2,948.01. We cannot excuse the defendant's conduct in connection with the Meyers loan.

## THE ROBERTS CHARGE.

8. In the accusation it is alleged that on May 8, 1918, the defendant was employed as attorney for W. M. Seward to loan $10,000 to D. K. May and Minnie M. May, who proposed to use the money in behalf of the Gibson Mining Company, Ltd., in the purchase of new machinery and equipment; that Seward required an assignment of certain stock in the mining company as security for the loan and in addition to that security he also required "security by way of collateral for said loan"; that the borrowers procured J. C. Roberts, who was interested in the mining enterprise, "to put up additional security by way of collateral only, of 79 shares of the capital stock of Peters & Roberts Furniture Co." of the par value of $100 each; that Roberts delivered six certificates of stock, numbered respectively 45, 47, 49, 56, 57,

and 65, to the defendant and that prior to such delivery Roberts "had indorsed his name on the back side thereof"; that it was understood that the stock delivered by Roberts "was to be deposited as collateral security only and not by way of guarantee"; that after the delivery of the six certificates of stock the defendant, with intent to defraud, altered the certificates of stock numbered 45, 47 and 49 by writing above the signature of Roberts the following matter:

"For value received I hereby assign the within certificate of stock and the shares therein represented to Walter M. Seward being as collateral security and I hereby guarantee to Walter M. Seward, his heirs, executors, administrators and assigns, that in case said stock or any portion thereof is resorted to for the purpose of satisfying the original debt or any portion thereof, for which this stock is deposited as collateral security, that the said stock shall realize sufficient to pay all claims Walter M. Seward may have by reason of the Ten Thousand Dollar note signed D. K. and Minnie M. May, given to the said Walter M. Seward this date not being paid in full or any portion thereof."

In May, 1918, W. M. Seward loaned $10,000 to D. K. May and Minnie M. May, his wife. The Mays were stockholders in the Gibson Mining Co., Ltd., which owns a group of mines in British Columbia. May and his wife borrowed the money to use in developing the mines. J. C. Roberts was also interested in this mining company. The loan was evidenced by a note signed by the Mays, and, as security for the note, they assigned to Seward 50,000 shares of stock in the mining company. Seward required additional security before agreeing to make the loan; and so Roberts agreed to turn over as additional security stock in the Peters & Roberts Furniture Co. Roberts says that it was understood that the stock turned over by him

should be held as collateral security and that he did
not make any agreement of guaranty. Seward died
and, after his death, the management of his affairs
came into the hands of George F. Brice. After
Seward's death the May note was prosecuted to a
judgment in a British Columbia court.

It is claimed that Roberts turned over to the de-
fendant for Seward seven stock certificates represent-
ing 80 shares of stock in the Peters & Roberts Furni-
ture Company. Only six certificates, representing a
total of 79 shares, are in evidence. These six certifi-
cates are as follows: No. 45 for 20 shares; No. 47 for
10 shares; No. 49 for 10 shares; No. 56 for 24 shares;
No. 57 for 14 shares; and No. 65 for 1 share. Cer-
tificate No. 38 for 1 share was not offered as evidence.
It is conceded that the genuine signature of J. C. Rob-
erts appears upon the back of each of the six certifi-
cates received in evidence; but it appears that Roberts
wrote his name thereon long prior to the Seward loan
and for another purpose. The guaranty set forth in
the accusation and quoted herein is typewritten on
the back of each of the three certificates numbered 45,
47 and 49 and above the signature of J. C. Roberts.
There was just room enough for writing the guaranty
above the signature on the back of certificates 45 and
47, and there was hardly sufficient space for the guar-
anty to be typed on the back of certificate No. 49 as
the typewritten matter runs over a part of the sig-
nature. As to the remaining three certificates in evi-
dence there is not sufficient space above Roberts' sig-
nature for the writing of the guaranty.

The defendant says that the guaranty was placed
upon the back of the three certificates with the au-
thority of Roberts. The defendant explained that he
wrote a form which was approved by Roberts, who

was then in the defendant's office, and that the form was sent to the stenographer's room and there typewritten upon the back of the certificates. The defendant asserts that the seven certificates were not all turned over to him at the same time but that Roberts handed them to him at different times. The defendant claims that he personally delivered to Seward certificates 45, 47 and 49 and that subsequently on May 25, 1918, he mailed the other four certificates together with a letter to Seward.

Roberts insists that he did not authorize the typing of the guaranty on the certificates, and that he first gained knowledge of the guaranty after Seward's death. Roberts says that after learning of the existence of the guaranty on the back of each of the three certificates he went to defendant's office; that the defendant said that he did not know anything about the matter on the back of the certificates and that the defendant tried to lead him to believe that Seward did it; that the defendant looked up his letter files and gave Roberts a letter written by Seward to the defendant under date of May 10, 1918, and told Roberts to make whatever use of it he could. It appears that the judgment against the Mays has been settled, so that the guaranty on the certificates did Roberts no actual damage.

The defendant gives a different explanation of the delivery of the Seward letter to Roberts. It is claimed by the defendant that when the May loan was negotiated Seward called for a financial statement concerning the furniture company in order that he might be advised of the value of the stock to be delivered by Roberts as security. The defendant claims that after Seward's death Roberts came to him and expressed a fear of being sued by Brice saying that

if Brice knew of the financial statement he would sue. The defendant claims that the financial statement was made in duplicate and that he gave the original to Seward and retained the carbon copy in his office files and since the May note had been reduced to judgment the statement was no longer needed as protection to the estate of his former client he gave his office copy to Roberts together with the Seward letter. The testimony of the defendant with reference to the delivery of the letter and statement to Roberts and the reason for such delivery is corroborated by the defendant's office manager.

The defendant explained the appearance of the guaranty on the three certificates and the absence of its appearance on the others by saying that the certificates bearing the guaranty were the first ones delivered and that they were the largest. The defendant is in part mistaken. Certificate No. 56 was larger than either of the three bearing the guaranty, and certificate No. 57 represented more stock than two of the certificates bearing the guaranty. Seward in his letter of May 10th says:

"That they [the Roberts stock] amount to approximately $12,000, according to his [Roberts] valuation."

Some of Seward's reasons for writing the letter of May 10th appear from the following excerpt taken from it:

"At the time we completed the D. K. May and J. C. Roberts transaction a few days ago I was in a hurry to see my physician and did not go carefully into those papers which I had entrusted to your judgment.

"In looking over these papers later I notice that the agreement with Mr. Roberts specified that he is to put up stock in the Peters & Roberts Company, of the par value of $40,000. My understanding of the value

of those stocks assigned by Mr. Roberts is that they amount to approximately $12,000, according to his valuation.

" * * The original agreement which I had with Mr. Roberts was to the effect that he would personally secure the above-mentioned $10,000 in consideration of my turning over the stock involved to him, providing I did not care to purchase it at the expiration of one year. The only reason therefore, as I understand it, that you agree with Mr. Roberts for him to share in the profits of this stock was in consideration of his furnishing material and absolute security to me for the money advanced to Mr. May.

"This being the case, I think that both you and Mr. Roberts will agree that the security furnished, namely, forty shares in Peters & Roberts Co., is not adequate security for the amount advanced. I think it very doubtful if one could realize at the expiration of two years five thousand dollars actual cash in this security together with accrued interest and court costs, etc., providing it went through process of court."

If Roberts agreed to guarantee, one is naturally prompted to ask: Why did Roberts not sign one paper guaranteeing all the certificates? If Roberts agreed to guarantee the stock at all why was the guaranty not placed on all the certificates instead of on three only? Something has been said also concerning the fact that on the three certificates bearing the guaranty there was sufficient space for typing the guaranty but that there was not sufficient space on the other three certificates received in evidence. In February, 1921, the defendant commenced an action against Roberts to recover $2,500. A month later he sued the Portland Syndicate of the Gibson Mining Company Ltd., for $25,000 for services rendered as attorney in connection with the mining property. There was considerable evidence relating to the defendant's conduct in handling the litigation for the

mining company, but that evidence need not be mentioned since the only misconduct alleged in the accusation relates to the guaranty.

We cannot but be mindful of the seriousness of this charge. It is to be regretted that sufficient evidence could not have been submitted to demonstrate the truth whatever it may be. We do not think that the evidence is sufficient to sustain the charge that the defendant fraudulently wrote the assignment on the back of the certificates.

We acquit the defendant of three of the charges specified in the accusation; but it is our conclusion that the evidence sufficiently supports the other specified charges, and because of such conclusion, we are constrained to order that the defendant be disbarred.

DEFENDANT DISBARRED.