Argued September 13, disbarred December 13, 1961

In re Complaint as to the Conduct of
# J. KELLY FARRIS
367 P. 2d 387

*Nels Peterson,* Portland, argued the cause for accused. On the brief were Peterson & Lent and Thomas J. Curran, Portland.

*Donald McEwen,* Portland, argued the cause for the Oregon State Bar. With him on the brief was James Morrell, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This matter comes before us upon a recommendation of the Board of Governors of the Oregon State Bar (ORS 9.020) that Mr. J. Kelly Farris, a member of the bar, be permanently disbarred from the practice of law. Mr. Farris was licensed by this court in September 1954. In August 1960 when the trial committee conducted its hearing Mr. Farris was 32 years of age.

The complaint (second amended complaint) alleged eleven counts or causes of complaint against the defendant. His answer denied all averments of wrongdoing. A trial was conducted by a hearing committee August 8, 9 and 10, 1960, in the course of which testimony was received which, as transcribed, covers 604 pages. Thereafter, when the recommendations of the trial committee came before the Board of Governors December 28, 1960, that agency received further testimony which, as transcribed, covers 250 pages. In addition to the testimony numerous exhibits consisting of documents were received in evidence.

The Board of Governors found that Mr. Farris (1) solicited professional employment by the use of paid solicitors in violation of ORS 9.510 and 9.520; (2) delivered to a newspaper reporter for the Oregon Journal bottles of whiskey to which he had attached (a) his professional card and (b) copies of complaints

recently filed by him in the federal court, all for the purpose of securing favorable publicity and of thereby drawing to his office professional employment; (3) filed (a) petitions for the appointment of guardians ad litum in two personal injury actions and (b) complaints in those actions, in all of which the verifications recited that the purported guardian swore before the defendant to the truth of the documents when in fact the defendant had never seen that individual and did not know him; (4) "at various times during the calendar year 1959 and during 1960, the Accused did seek to solicit and obtain professional employment by advertisement of his activities and accomplishments in the form of newspaper items in the Oregonian, a newspaper of general circulation in the state of Oregon, The Portland Reporter, a newspaper of general circulation in the state of Oregon; and Tee Talk, a publication of the Oswego Country Club"; (5) attempted to obtain a money settlement from a casualty insurance company by filing personal injury actions in behalf of two minors, Judie Anne and Janice Lee Hjulstad, when he knew or reasonably should have known that the minors had not suffered any injury; and (6) conducted himself in the episodes just mentioned in such a manner that if he were now applying for admission to the bar his petition would be denied.

We mentioned that the complaint (second amended complaint) set forth eleven causes of complaint. During the hearing the Board of Governors withdrew one of the causes. After its close the Board of Governors ruled that the evidence failed to sustain two of the causes; it found the defendant guilty of the remaining eight. We have consolidated the eight into the six subdivisions set forth above.

The brief filed by the defendant in this court submits the following as the questions which await decision:

"Is due process under the 14th Amendment to the U. S. Constitution violated by Rules of Procedure of the Oregon State Bar relative to disbarment, discipline, etc., with particular reference to section 25 which permits amendment of a complaint 'at any time'?

"Is due process under the 14th Amendment to the U. S. Constitution and the constitutional rights and privileges of the accused violated when rules of evidence are not followed by the Trial Committee and not required by the Rules of Procedure?

"Is due process under the 14th Amendment to the U. S. Constitution violated and a fair hearing denied to the accused, when an attorney serves as prosecutor of the accused on a matter arising from a civil action of law wherein the prosecutor has been an attorney for a party in said action at law?

"Is Due process under the 14th Amendment to the U. S. Constitution, or judicial fairness violated, when the statute of limitation of the State of Oregon relating to crimes, or the doctrine of laches, have not been followed as to the accusations made against accused?

"Are constitutional requirements of certainty met in sections 9.500, 9.510 and 9.520, ORS, as applied to these proceedings?

"Are the charges relating to unethical conduct supported by clear and convincing evidence?

"Is the charge of criminal activity supported by proof beyond a reasonable doubt?

"Does due process require dismissal or resubmittal of the charges to a newly appointed trial committee and the Board of Governors by reason of absence of two-thirds of the Board of Governors upon Recommendation as required by Section 9.540 ORS?"

The first assignment of error challenges the constitutionality of Section 25 of the Rules of Procedure of the Oregon State Bar. It is claimed that due process under the Fourteenth Amendment of the United States Constitution was denied to the accused when the trial committee permitted the filing of a second amended complaint. Further denial of due process is asserted due to an amendment to the complaint which was permitted during the course of the hearing that the Board of Governors conducted.

Section 25 of the Rules of Procedure of the Oregon State Bar follows:

"A complaint may be amended at any time to set forth additional facts, whether occurring before or after commencement of the hearing or investigation, either in amplification of the original charge or to add new charges. In case of such amendment, the accused shall be given reasonable time, to be fixed by the Board or trial committee, to answer the amended complaint, to procure evidence and to defend against the misconduct charged. The Board or the trial committee may at any time allow or require other amendments to the complaint or to the answer."

While a precise definition of due process continually evades the facility of courts to express it, the essential elements envisioned within the concept of due process are not in dispute. *Fuller-Toponce Truck Co. v. Public Service Commission*, 99 Utah 28, 96 P2d 722, 725, quotes with approval from 12 Am Jur, Constitutional Law, § 573, pages 267-268, the essential elements of due process:

"* * * The essential elements of due process of law are notice, and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause."

■ It will be noticed that Section 25 of the Board's Rules of Procedure directs that the accused shall be given nothing less than reasonable time to answer, to procure evidence and to defend against any amendments that may be allowed. Therefore, Section 25 provides for all the essential ingredients of due process that are pertinent to the issues before us. The record indicates clearly that both the trial committee and the Board of Governors at all times followed the procedure demanded by Section 25. This assignment of error is therefore dismissed.

■ The second assignment of error complains that the trial committee erred in not following the rules of evidence, particularly those concerning confidential communications between an attorney and his secretary as set forth in ORS 44.040(1)(f); thereby, according to the defendant, due process of law was denied to him. Rule 32 of the Board's Rules of Procedure relative to disbarment declares, in part:

"* * * No finding, recommendation, order, decision or determination made in a disciplinary proceeding shall be invalidated on the ground of error in the admission or rejection of evidence, or in pleading, or in procedure, or upon other ground, unless, upon the whole record, including the evidence, the Board shall be of the opinion that error which resulted, or would result, in the miscarriage of justice, has occurred."

The above section does not impinge upon the elements of due process as discussed above. Further, assuming for the sake of argument only that the privileged communication between the accused and his secretary was violated, her testimony did not lead to a miscarriage of justice. Most of her testimony related to a charge which was abandoned by the Bar. The other charge

to which she testified, that is, delivering to newspaper reporters bottles of whiskey with complaints and professional cards attached to them, was substantiated by the testimony of others. The defendant, as a witness, did not deny the delivery. Thus, her testimony can not be deemed prejudicial. This assignment of error lacks merit.

■ The third assignment of error predicates irregularity upon the appointment by the Oregon State Bar of Mr. James Morrell as one of the prosecutors in this proceeding. The defendant rests his claim of error upon the fact that Mr. Morrell is a member of a law firm that serves the Travelers' Insurance Company as attorney. Terry Zimmerman, a party to the automobile collision involved in the solicitation charge against the defendant, was insured by Travelers' Insurance Company, and it is claimed that Mr. Morrell therefore had a personal interest in this proceeding.

■ We have read with care all of the testimony which was given before the trial committee and the Board of Governors, but found no indication of conduct upon the part of Mr. Morrell which invaded or could have prejudiced the rights of the accused. Mr. Donald McEwen was chief counsel for the Bar in the prosecution of the case, and Mr. Morrell played a secondary role. Concerning Mr. McEwen, the defendant, near the close of the hearing, said:

> "No, Sir, I do not think you are trying to trick me, Mr. McEwen, I wish to make it clear that you have been a gentleman throughout these proceedings."

We find no merit in this assignment of error; we add, however, that no attorney should be appointed as prosecutor who is counsel for a client interested in

the disbarment case. Those who prosecute should be free from all entanglements that could prompt a surmise that their purpose is other than to serve the best interests of jurisprudence.

■ The fourth assignment of error argues that the trial committee and the Board of Governors erred in conducting this hearing upon charges that had been barred, so the defendant says, by the statute of limitations and the doctrine of laches. That contention is directly opposed to the expressed views of this court. In *State ex rel Multnomah Bar Association v. L. H. Tarpley,* 122 Or 479, 259 P 783, the decision quoted with approval from 2 Thornton on Attorneys at Law, Section 880:

"The statute of limitations does not constitute a bar to the prosecution of disbarment proceedings; nor will such proceedings be barred by mere laches. * * * *"

See to like effect *State v. Woerndle,* 109 Or 461, 109 P 604, 220 P 744; *State v. Parker,* 120 Or 465, 252 P 711; and *State Mannix,* 133 Or 329, 288 P 507, 290 P 475. We dismiss this assignment of error as lacking in merit.

■ The fifth assignment of error complains that the statutes relating to solicitation (ORS 9.500 and 9.510) as applied to the accused, are so vague and indefinite as to constitute a denial of due process. This complaint is based upon an ambiguity which the defendant says he finds in the word "solicit." In previous cases that word did not appear to this court to be uncertain in meaning. To the contrary, the court experienced no difficulty with it. In *City of Portland v. Stevens,* 180 Or 541, 178 P2d 175, this court said:

" 'Solicit' is defined as 'to importune'; 'to endeavor to obtain by asking or pleading.' "

*Phillips v. City of Bend,* 192 Or 143, 234 P2d 572, quotes that definition and adds:

> "The word 'solicitor' applies 'to all individuals who are engaged or employed especially for the purpose of soliciting, importuning or entreating for the purchase of goods, etc.' "

The word "solicit" is defined in Black's Law Dictionary, 4th ed., page 1564, as follows:

> "To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain; and though the word implies a serious request, it requires no particular degree of importunity, entreaty, imploration, or supplication. * * *"

It is our belief that ORS 9.500 and ORS 9.510 in plain language make it unlawful for an attorney to solicit personal injury claims either directly or through an agent. This assignment of error is dismissed.

Assignments of error 6 and 7 claim that error was committed by the trial committee and by the Board of Governors in finding the accused guilty of (1) unethical conduct upon evidence which was not clear and convincing, and (2) violation of ORS 9.520 when the charge was not established beyond a reasonable doubt. These assignments of error will be treated together since both deal with the degree of proof required to substantiate charges in proceedings of this character.

■■ The extent of persuasion which the prosecutors in disbarment proceedings must effect does not vary according to the type of conduct which is charged. A disbarment proceeding is of civil and not criminal nature. *State ex rel Montgomery v. Estes,* 105 Or 173, 209 P 486. *In re Moynihan,* 166 Or 200, 111 P2d

96, declares that the purpose of a disbarment proceeding is:

> "* * * 'not * * * to punish the accused attorney, as in matters of criminal cognizance, but * * * as "necessary for the protection of the court, the proper administration of justice, and the dignity and purity of the profession, and for the public good and the protection of clients" ': Ex parte Finn, 32 Or. 519, 52 P. 756, 67 Am. St. Rep. 550."

Thus, the degree of proof need not be beyond a reasonable doubt as the defendant contends in his seventh assignment of error. However, this court has ruled that it must be something more than a mere preponderance of evidence, and has expressed the needed extent of persuasion by saying that the evidence must be clear and convincing. *In re Irwin,* 162 Or 221, 91 P2d 518; *State v. Mannix,* supra; *State v. Estes,* supra; *State v. Garland,* 77 Or 92, 150 P 289; *In re Moynihan,* supra. The decision last cited states:

> "The trial committee that heard the witnesses 'is better qualified to determine disputed questions of fact than we who read the cold, printed record,' and while its determination 'is not conclusive, it must, in the very nature of things, be entitled to respect.' See Homan v. Hirsch, 106 Or. 98, 211 P. 795."

 Since this matter comes to the court de novo it is our duty to determine whether or not the finding of guilt is sustained to the degree of persuasion set forth in the preceding paragraph. In resolving that issue we are at liberty, as indicated in the Moynihan decision, to avail ourselves of the help afforded by the work performed by the trial committee and the Board of Governors in their analysis, sifting, scrutiny and critical examination of the evidence. The members

of those two bodies are engaged in the active practice and are, therefore, peculiarly qualified in cases of this kind to weigh evidence, to judge motives and to detect the truthful witness from the false or mistaken. We note that members of the trial committee, as also the members of the Board of Governors, asked many questions which elicited enlightening answers.

We believe that the findings adverse to the defendant are supported by competent evidence which carries conviction to the required degree.

The issue as to whether or not the defendant was retained to represent the Hjulstads in the four claims that we have mentioned through the services of a paid solicitor received extensive attention during the two hearings. October 12, 1957, Mr. John Hjulstad, husband of one and father of the other two Hjulstads, was driving his automobile with the entire family in it upon one of the thoroughfares in the city of Portland when it was struck by an automobile driven by Terry Zimmerman. Property damage was inflicted upon the Hjulstad automobile, but according to the Bar, no injury was suffered by any of the four Hjulstads. Entries in the files of the defendant indicate that none of the Hjulstads received any injury, but in an explanation of his conduct, which we will presently mention, he claims that he was not aware of those entries.

The Bar contended that an insurance adjuster by the name of Ned Bristol, who called upon the Hjulstads in behalf of his employer, recommended the defendant to the Hjulstads and was paid $20 by the defendant for so doing. Mr. Bristol, as a witness, freely conceded that he recommended the defendant. Shortly after he had made the recommendation Mrs. Hjulstad

telephoned the defendant, with whom she was wholly unacquainted. The defendant, according to the Bar, sent to the Hjulstad home a young man who was in the employ of the defendant's firm as an associate. The young associate had been a member of the Bar for only a few weeks. In the course of his call upon the Hjulstad family the defendant's firm was retained to represent the Hjulstads in any claims they might have arising out of the collision.

Mr. Bristol testified that shortly after he had recommended to the Hjulstads that they employ the defendant the latter paid him twenty dollars, but swore that the sum was given to him for services requested by the defendant in investigating the accident out of which the claims arose. He testified that a part of the duty which he undertook in consideration for the $20 was to furnish the defendant with a copy of the report made by the police officers who investigated the accident, and also to provide the defendant with a statement made by bystanders who saw the accident occur. The police did not investigate this accident and, accordingly, no report of that kind was available. The evidence also showed that no one except the four Hjulstads and Mr. Zimmerman, who drove the other car, saw the accident occur. Therefore, there were no bystanders. The $20 check is an exhibit in the case. It was made payable to "cash" and although it has space which is headed thus: "This check is in payment of items as per statement following," nothing whatever was written in the available space. Upon the back of the check there is Mr. Bristol's endorsement. The only tangible work product which could be deemed investigative in nature which Bristol performed was his delivery to the defendant of a copy of the report which Bristol obtained from the Hjul-

stads while investigating the case for the insurance company that had employed him.

The Committee on Legal Ethics of the State Bar, with the approval of the Board of Governors, has ruled (Oregon State Bar January 1954, page 91, and Pocket Part Oregon State Bar Bluebook, page 37) that an attorney may discharge expenses of that nature only "subject to reimbursement." The evidence indicates clearly that when the defendant gave Mr. Bristol the aforementioned sum of $20 he had no thought of being reimbursed by the Hjulstads. In fact the evidence does not indicate that the Hjulstads were ever apprised of any work performed by Mr. Bristol, let alone any request for reimbursement. That fact appears to indicate that Bristol was given the money for soliciting and not for investigating.

When this matter was before the Board of Governors Mr. Farris testified that the first time that he was aware of the Hjulstad claims and that his firm had assumed charge of them was "sometime in early November" which would be approximately a month after the defendant's young associate had called upon the Hjulstads. The record indicates that the associate was assigned to the Hjulstad claims by the defendant. The defendant swore that his first knowledge of the case was "a case that was in the office." However, on March 20, 1959, after the State Bar had decided to investigate the manner in which the defendant was employed to represent the Hjulstads and had appointed Mr. McEwen to conduct the investigation and the latter had written to the defendant for an explanation, Mr. Farris wrote on March 20, 1959, to Mr. McEwen:

"I state that I recall receiving a telephone call from someone with a female voice who identified

herself as a Mrs. Hjulstad and this was in late October or early November of 1957. I state that I recall that the female voice identified as Mrs. Hjulstad advised me that she and her husband and two children had been involved in an automobile accident and that she wanted my advice as to what she should do. I state that I recall this incident was the first knowledge of this case that I had received. I state that I recall that * * * [we omit the young associate's name] was thereupon assigned responsibility for investigating and preparing the case * * *."

After the defendant had testified more than once that he did not know how the Hjulstad case came to his office and that he did not know who had assigned it to his young associate, a member of the Board of Governors asked him:

"Q In response to a question, you said you did not know how this Hjulstad case came into your office. Isn't it rather unusual in an office your size [two members] that the senior member of the firm would not know how cases come into the office?

"A I don't know whether it is unusual or not, Professor Howard. I know I did not know at this time how it came into the office, and I still don't know * * *."

Then the President of the State Bar confronted the defendant with the statement that he had made to Mr. McEwen in the letter from which we just quoted. Shortly, another member of the Board of Governors examined the defendant as follows and received the answers that we now quote.

"Q Maybe I don't read this accurately, but your testimony today, Mr. Farris, is that your first knowledge of the Hjulstad case was as a case that was in the office, but you don't know how it came

into the office? Is that the essence of your testimony today?

"A Yes, sir, it is.

"Q And in your letter of March 20, 1959 that we have been talking about, you wrote that it came into your office as a result of a telephone call from Mrs. Hjulstad to yourself?

"A I stated that I recalled receiving a telephone call from a lady who identified herself as a Mrs. Hjulstad, yes, sir.

"Q You think that your recollection as of the date when you wrote that letter was inaccurate?

"A I didn't know on March 20th and I still don't know today what caused Mrs. Hjulstad to call me. I know that was the first contact I had.

"Q That isn't the point of my question. That is why I started out with the statement that I maybe misunderstood you.

"As I get your testimony today, you are telling the Board of Governors that you first knew of this Hjulstad matter as a case in the office, that you didn't know how it came into the office?

"A Yes, sir.

"Q As I read your letter of March 20, 1959, you didn't perhaps spell it out in so many words, but you indicate that the case came into the office, as far as what you were telling Mr. McEwen, as a result of Mrs. Hjulstad phoning you personally to take the case?

"A Yes, sir.

"Q Is that right?

"A That was my recollection and that is my recollection, yes, sir. That was my first knowledge of it. I regard that as a case in the office when she calls me.

"Q That is what I want to make clear. You are not trying to say now that this case didn't originate

in the office as a result of a telephone call from Mrs. Hjulstad to yourself?

"A I think that is how it probably did originate. All the evidence indicates that it did originate in that manner.

"Q I guess I am not as bright as I hope I used to be. I can't reconcile that testimony with your testimony that you first knew of this as a case that was in the office but you don't know how it came into the office."

It is clear that Mr. Bristol induced the Hjulstads to telephone to the defendant and that in that manner this item of business came to the defendant's office. The defendant clearly was aware of that fact from the very beginning. His self-contradictions, evasiveness and lack of frankness, of which the above is only one illustration, was hurtful to his credibility.

Mr. Bristol stated that he received $3 per hour plus expenses for services that he performed in the investigation of accidents. He also testified that he had a high regard for the defendant and recommended him to the Hjulstads without expectation of remuneration. He swore that he had done some work for the defendant in the investigation of personal injury cases in the past and that in recommending the defendant he may have hoped to induce the defendant to hire him in future cases.

The three members of the trial committee found that the charges that the defendant solicited, through a paid representative, the Hjulstad claims was supported by the required degree of proof. The trial committee's finding was entered November 16, 1960. The matter came before the Board of Governors December 15, 1960. The Board of Governors wished to have more enlightenment concerning the manner in

which the Hjulstad claims came to the defendant and, accordingly, December 28, 1960, held a hearing in the course of which, as we have indicated, more testimony was received which, as transcribed, covers 250 pages. At the conclusion of that hearing counsel for the Bar and for the defendant presented oral arguments. We now quote from a part of the Board's findings.

> "This entire matter thereafter came on for final determination by the Board of Governors at a meeting thereof held in Portland, Oregon, on January 14, 1961. All twelve members of the Board of Governors were present and participating.
>
> "By unanimous vote, the Board of Governors found, and does hereby find, the Accused guilty of the charges set forth in the first and second causes of complaint herein, as amended aforesaid."

The words of the quoted language, "the charges set forth in the first and second causes of complaint," refer to the Hjulstad claims.

The Board's findings are amply supported by the evidence and are entitled to added weight because of the evasiveness of the accused as a witness. We think that the record shows that he received the Hjulstad claims through Mr. Bristol's paid solicitation.

The next finding of guilt relates to the charge that the defendant delivered whiskey accompanied by his business card and copies of complaints recently filed by him in the courts to a reporter for the Oregon Journal. According to the Bar, the defendant's purpose was to obtain publicity in that newspaper for business promotional purposes. We observe that at the outset the defendant testified:

> "I do not recall, I delivered a bottle of whiskey I do not recall any specific instances that either Mrs. Steel [his secretary] or * * * [his aforementioned associate] delivered a bottle of whiskey.

I do recall vaguely that a bottle of whiskey was delivered either to * * * and/or * * * [reporters for the evening and morning newspapers in Portland], but I do not recall specific instances and I do not recall the occasion.

* * *

"I, I want to make that clear, I do not know of any of these people whom I just mentioned delivered any, if they did, my vague recollection would probably be two such occasions."

It is clear that the defendant's acquaintanceship with the two newspaper reporters was not such that it would have been natural for him to have made gifts to the two men out of a spirit of friendship. The defendant testified:

"I was casually acquainted with them by sight. I don't recall in 1958 whether I was personally acquainted with either one of them. I think I recognized them, and I think they recognized me."

The record makes it clear that the defendant, through his associate and through his secretary, delivered the liquor to the two newspaper men. The bottles were accompanied by the defendant's professional card and copies of complaints that he had recently filed in the federal court. One of the reporters before long gave the defendant extensive newspaper publicity in connection with a personal injury trial that the defendant had recently conducted. In view of the fact that the defendant had a very scant acquaintanceship with the two newspaper men before he made the gifts, and accompanied the latter with professional material, the inference seems inescapable that his purpose was to secure publicity helpful to his practice. We believe that evidence which meets the demand for clear and convincing quality established this

charge and that this assignment of error is without merit.

The next finding of guilt charges that the defendant filed documents in the Hjulstad cases which recited that they were subscribed and sworn to before the defendant when, as a matter of fact, that recital was untrue. The defendant more than once testified that he had not met personally any member of the Hjulstad family. That admission substantiates the charge that the documents were not sworn to and subscribed by any member of the Hjulstad family before the defendant. This assignment of error lacks merit.

The next finding of guilt charges that the accused sought to obtain professional employment by advertisement of his activities and accomplishments in the form of newspaper articles in the Oregonian, the Portland Reporter and Tee Talk, a publication of the Oswego Country Club. Two of the articles were written by one of the reporters who received liquor from the defendant. The defendant's associate admitted delivering a bottle of whiskey to that reporter. We have mentioned the fact that the reporters had scarcely a nodding acquaintance with the defendant when the gifts were made. We are satisfied that the articles written by the reporter just mentioned were, in effect, solicited by the defendant.

The third article, appearing in Tee Talk, was written by a Mrs. Goodrich. The evidence reveals that Mr. Farris had never spoken to her concerning the article. She neither asked Mr. Farris for permission to write the article nor interviewed him before composing it. Further, the article concerned a news item worthy of comment. The record does not satisfy us that Mr. Farris solicited this article.

The last charge of which Mr. Farris was found

guilty is based upon his conduct in (1) trying to obtain a money settlement, and after the failure of his efforts, (2) instituting actions to collect for personal injuries for the two Hjulstad daughters when he knew, or in the exercise of reasonable diligence, should have known that no member of the Hjulstad family had suffered any injury.

No medical examination was ever made of any of the Hjulstads on account of anything that resulted from the collision. In fact, Mrs. Hjulstad told the defendant's associate that her family did not think it was necessary that they see a physician and that they were not injured. There is no claim that Mr. Farris' file on the Hjulstad case contains any intimation that injury was sustained by any member of the family. The only statement found in the file relating to injuries states that none were incurred. Yet, the complaint which was filed on behalf of Janice Lee Hjulstad, one of the two daughters, declares:

"* * * Plaintiff has suffered special damages for medical care, X-rays and treatment of physicians in an amount at this time unknown, and plaintiff has suffered general damages in the amount of six thousand five hundred ($6,500.00) dollars."

The complaint filed in the case of Judie Anne Hjulstad contains a statement of exactly the same kind. Mr. Herman Welch who was an adjuster for the Travelers' Insurance Company which had issued a policy upon the Zimmerman car, testified that when he called upon the defendant the latter:

"* * * furnished copies of the complaints that he intended upon filing * * *

* * *

"Then he asked, as I recall, one thousand apiece for the two children and seven hundred fifty apiece for the husband and wife."

Mr. Welch gave further testimony as follows:

"Mr. Welch, the conference in Mr. Farris' office which you have just related, during that conversation did he exhibit four complaints?

"A Yes. That is when he exhibited them, at the conference.

"Q Were those complaints to be filed in court to institute a law suit?

"A That was my understanding, the way he presented it to me.

"Q Did he indicate to you that he would file those complaints by a certain time if the demand was not met?

"A As I recall, it was by 5:00 that afternoon, and I think we met in the latter part of the morning."

We have mentioned the fact that no member of the Hjulstad family had verified the complaints. Mr. Hjulstad was appointed guardian ad litum for his daughters, but had verified neither the petitions for appointment nor the complaints. He likewise had not verified the complaint which had been prepared for his own action, nor had Mrs. Hjulstad verified the one prepared for her action. The Hjulstads had signed the pleading's back in the space provided for verification, but testified that in doing so they believed the papers had a bearing upon a prospective medical examination of which defendant's associate spoke. The complaints in the actions for the two daughters were filed about two months after the Travelers' Insurance Company refused to meet the demands made by Mr. Farris. It is very evident that the defendant's associate, upon being told by Mrs. Hjulstad that the family had suffered no injury, was most reluctant to file the complaints. However, later the complaints in the daughters' cases were filed and subsequently the cases

were assigned for trial upon the docket of the circuit court. Thereupon the Hjulstads were informed of that fact. At that point Mrs. Hjulstad wrote to Mr. Farris:

> "Received your letter of the 30th of August. The last time that we spoke of this case was to * * * [defendant's associate] the last days of May of '58. We had previously told him we wanted the case dropped * * *. We do want it understood that we do not care to have any case pending and want the matter dropped."

Thereupon Mr. Farris dismissed the two actions.

The fact that Mr. Farris dismissed the Hjulstad actions for personal injuries after Mrs. Hjulstad demanded that "they be dropped" does not relieve him of the charge that he demanded settlement when he knew that no injuries had been incurred by his clients, nor does it relieve him of the fact that he had filed the complaints when he knew or should have known that his clients had received no injuries. The evidence reveals no basis upon which Mr. Farris in good faith could have alleged personal injuries. The finding of guilt in this matter is therefore sustained.

The eighth assignment of error complains that error was committed in submitting recommendations for disbarment or suspension when two-thirds of the Board of Governors did not agree as required by ORS 9.540 which provides, in part:

> "The board of governors may, by a two-thirds vote, after a hearing for any of the causes set forth in the statutes warranting disbarment or suspension, or for any breach of the rules of professional conduct, make an order recommending to the Supreme Court the disbarment of any member, or that such member be disciplined by reproval, public or private, or by suspension from practice. * * *"

Not merely two-thirds, but all of the members of the Board of Governors were of the opinion that some form of discipline should be imposed upon Mr. Farris. The only difference of opinion was as to the severity of the discipline that the circumstances demanded. This court's power to discipline members of the Bar is not dependent upon the recommendations of the Board of Governors. The judgments of this court pertaining to discipline and disbarment are based on a de novo review of the record. This assignment of error lacks merit.

The above disposes of all of the assignments of error.

The circumstances afford us no alternative except to adopt and put into effect the recommendation of the Board of Governors.

An order for permanent disbarment will be entered. It will award the Oregon State Bar judgment against the defendant for its costs and disbursements as directed by Oregon Laws 1961, Chapter 499, section 5 (2).