Argued January 13, petitioner ordered removed from office March 22,
petition for rehearing denied by opinion April 12, 1978
See 281 Or 638

# In the Matter of
# The Honorable SHIRLEY A. FIELD, Judge.
## (SC 25453)

576 P2d 348

Margaretta M. Eakin, Portland, argued the cause for petitioner. With her on the brief were David F. Cargo, Portland, and Leslie M. Roberts, Portland.

John L. Schwabe, and George H. Fraser, Portland, argued the cause for the Commission. With them on the brief were Donald Joe Willis and E. Joseph Dean, Portland.

PER CURIAM.

**PER CURIAM.**

This is a proceeding under amended Section 8 of Article VII of the Oregon Constitution and ORS 1.430 relating to the power of this court to remove, suspend or censure a judge. We are deciding upon the record made before the Commission on Judicial Fitness whether Judge Shirley A. Field should be removed from her position as Judge of the District Court for Multnomah County.

Judge Field was appointed a judge of the District Court for Multnomah County in July, 1972, and was elected to that position in November, 1972.

On May 25, 1977, a Notice of Complaint and Inquiry charging Judge Field with various acts of misconduct was filed by the Commission on Judicial Fitness (Commission). The complaint contained an allegation that the Commission "reserves the right to amend this complaint and inquiry at any time prior to hearing." On June 8, Judge Field filed an answer containing admissions, denials and explanations of the charges. The answer also contained a reservation of the right to amend at any time prior to trial. On July 8, 1977, the Commission advised Judge Field that the hearing on the charges was set for August 8, 1977. Several days before the hearing, counsel for Judge Field was notified that the Commission intended to file an amended complaint, and such amended complaint was filed on August 8, 1977. On September 19, 1977, the Commission filed Findings of Fact, Conclusions of Law, and a recommendation that Judge Field be removed from her position as a district judge for Multnomah County.

In November of 1968 the people of the State of Oregon added amended Section 8 to Article VII of the Oregon Constitution:

"Section 8 Removal of Judges

"(1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court

may be removed from his judicial office by the Supreme Court for:

"(a) Conviction in a court of this or any other state, or of the United States, of a crime punishable as a felony or a crime involving moral turpitude; or

"(b) Wilful misconduct in a judicial office involving moral turpitude; or

"(c) Wilful or persistent failure to perform judicial duties; or

"(d) Habitual drunkenness or illegal use of narcotic drugs.

"(2) Notwithstanding section 6 of this Article, the methods provided in this section and in section 18, Article II of this Constitution, are the exclusive methods of removal of a judge from the judicial office."

Effective June 24, 1976, the people amended this constitutional provision so that it now reads as follows:

"(1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed *or suspended* from his judicial office by the Supreme Court, *or censured by the Supreme Court,* for:

"(a) Conviction in a court of this or any other state, or of the United States, of a crime punishable as a felony or a crime involving moral turpitude; or

"(b) Wilful misconduct in a judicial office *where such misconduct bears a demonstrable relationship to the effective performance of judicial duties;* or

"(c) Wilful or persistent failure to perform judicial duties; or

"(d) *Generally incompetent performance of judicial duties; or*

*"(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court; or*

*"(f)* Habitual drunkenness or illegal use of narcotic *or dangerous* drugs.

"(2) Notwithstanding section 6 of this Article, the methods provided in this section, *section 1a of this Article* and in section 18, Article II of this Constitution, are the exclusive methods of *the* removal *suspension, or censure* of a judge." (New material in italics.)

[ 626 ]

The Commission found that Judge Field's behavior throughout her tenure as judge constituted wilful misconduct, wilful failure to perform judicial duties, persistent failure to perform judicial duties, and also found her performance of judicial duties to be generally incompetent.

Preliminarily, Judge Field challenges the filing of the amended complaint before the hearing started on August 8, 1977, and contends the amended notice lacked sufficient information to apprise her of the charges and deprived her of an opportunity to refute them. She also contends that one or more of the members of the Commission had prejudged the facts before the hearing.

■ We shall discuss first the allegation of a prejudgment of the facts. She states that two of the commissioners had made public statements that she was incompetent. The record shows that Judge Field knew of the public statements prior to the hearing. Her counsel wrote a letter to these two commissioners before the hearing but did not request that they be disqualified.[1] On the second day of the hearing, the chairman advised Judge Field and her counsel that the letters had been received. Again, no objection or request for disqualification was made.

■ In addition to the failure to request that the two commissioners disqualify themselves, there is another reason why this challenge to the Commission's findings must fail. We review the record to decide independently the facts and what action is to be ordered by

---

[1]The letter, dated August 3, 1977, stated in part:

"I have been requested by my client, Judge Shirley Field, to forward to you a copy of an editorial which apparently appeared in the Bend Bulletin on February 24, 1976. Judge Field says that she has a question in her mind as to whether or not you can sit with impartiality as a member of the Commission hearing her case. I have no personal knowledge as to whether you could or couldn't, and thus I take no position. Apparently she feels that you should give some thought as to whether or not you could serve impartially and any questions in connection with this matter you might have, please feel free to call me."

this court. ORS 1.430(1) and *see also Matter of Del Rio,* 400 Mich 665, 256 NW2d 727 (1977).

Judge Field's next contention is that the filing of the amended complaint deprived her of an opportunity to defend herself in that it was an untimely presentation of new charges. This contention must also fail. As previously noted, the original complaint advised Judge Field that the Commission reserved the right to amend at any time prior to the hearing, as she reserved the right to amend her answer at the hearing. Judge Field was advised several days before the hearing that an amended complaint would be filed. No motion for a continuance was made at that time or at the hearing. Moreover, at the conclusion of the hearing the Commission specifically offered to return for further consideration of any matters, and she declined.

Judge Field alleges that the new matter in the amended complaint consisted of Charges 33, 34 and 35 in Count II,[2] and all of Count VII. Count VII, contrary to the allegation, is not new as it appeared in both the original and amended complaints. Charges 33 and 35 are also not new matter but are merely a delineation of Charge 24, which appears in both complaints and charges Judge Field with failure to give criminal defendants their constitutional and statutory rights. Charge 34, that she failed to appoint certain qualified attorneys to represent criminal defendants because such attorneys had filed affidavits of prejudice against her, is new and involved incidents that allegedly

---

[2]The new charges were as follows:

"33. Inquiree has engaged in conduct intended to, or highly likely to, coerce a defendant to plead guilty.

"34. Inquiree has intentionally refused to appoint certain qualified and experienced attorneys to represent criminal defendants because those attorneys, in good faith, filed affidavits of prejudice against her or because those attorneys provided information in connection with the investigation conducted by this Commission.

"35. Inquiree has either willfully or persistently failed or refused to follow proper legal procedures for accepting guilty pleas from criminal defendants."

occurred subsequent to the filing of the original complaint.

Although we believe that Judge Field waived any alleged procedural defect and that she was not prejudiced, we shall decline to consider the incidents connected with Charge 34, the only new matter raised by the amended complaint.

Before discussing the merits of the charges against Judge Field, we should consider the quantum of proof necessary to censure, suspend, or remove a judge.

Both the Commission and Judge Field agree that the proof should be clear and convincing before a judge may be censured, suspended, or removed from office. *Geiler v. Commission on Judicial Qualifications,* 10 Cal 3d 270, 515 P2d 1, 110 Cal Rptr 201 (1973); *In re Nowell,* 293 NC 235, 237 SE2d 246 (1977). This is the standard of proof required in bar disciplinary proceedings, *In re J. Kelly Farris,* 229 Or 209, 367 P2d 387 (1961), and we believe the same standard should apply to members of the judiciary. In deciding whether the proof is clear and convincing, we review de novo and make our own independent evaluation of the evidence. We then decide whether the conduct, based on our findings of the facts, constitutes conduct proscribed by the Oregon Constitution. *Geiler v. Commission on Judicial Qualifications, supra.*

Judge Field's initial contention on the merits is that we may not consider incidents which occurred prior to June 24, 1976, the effective date of the changes to Article VII, section 8, of the Constitution enacted in May of that year. Judge Field argues that to do so would give retrospective effect to the amendment, because none of the provisions of the 1968 version of the amendment apply. Judge Field also argues that such a retrospective application would be impermissible. We need not address this argument if the acts in the complaint occurring after June 24, 1976, are of sufficient weight to support a finding that the Constitution as amended has been violated. One of the

[ 629 ]

findings against Judge Field was that her performance of judicial duties was generally incompetent. We agree, and conclude that the incidents outlined below demonstrate general incompetence. Because all of them occurred after June 24, 1976, we do not pass on the retroactivity of the 1976 amendments. We now turn to the facts that are the foundation of our conclusion.

A deputy district attorney testified that on September 7, 1976, a defendant who had been in custody since September 4 was brought before Judge Field for parking violations. He entered pleas of not guilty and advised the judge that he was not the driver or the owner of the vehicle. He also stated that he had no driver's license and had no interest in the vehicle that had received the tickets, and that the car belonged to a friend. The deputy testified:

"Now, that was Mr. Mellon's [defendant's] explanation of the situation. Judge Field, after listening to this explanation, said, 'Well, I am going to tell you what we are going to do, Mr. Mellon; we are going to hold you hostage. We are going to wait and see if we can get your friend in here.'

"Mr. Mellon said, 'Is there any way I can get out of this thing?' She said, 'Yes, you can pay the fine.' I think it totaled up to $30 some dollars, something of that nature.

"Mr. Mellon indicated that he didn't have that kind of money and inquired whether or not he could make a phone call. The Judge indicated that he could not make a phone call. That concluded the proceedings on Tuesday.

"Then Mr. Mellon, on Wednesday, was brought in again and he was informed that his friend had not yet—I might add parenthetically here that after Mr. Mellon was taken away on Tuesday, Judge Field entered a bench warrant for his friend, who Mr. Mellon had named and given an approximate address for.

"On Wednesday, Mr. Mellon was brought in again and was again informed or informed at that time, that his friend had not been located; that he was going to remain as our hostage—I think those are the words that the Judge used.

[ 630 ]

"Mr. Mellon again inquired if he could make a phone call and the Judge again said, 'No, you cannot make a phone call.'

"On Thursday, which would have been the third day, I, myself, contacted the American Civil Liberties Union to see if something could be done for Mr. Mellon. That morning he was released by Judge Field.

"Q   When was Mr. Mellon first put in jail?

"A   It would have been the Saturday prior.

"Q   And he was released on Thursday morning?

"A   Yes.

"Q   Then he was in jail all five days?

"A   Saturday, Sunday, Monday, Tuesday, Wednesday, and part of Thursday.

"* * * * *.

"Q   Do you know what happened so far as the disposition of these parking tickets?

"A   Yes, on Thursday, when Mr. Mellon was brought in, the Judge sentenced him to pay the fine and gave him credit for the time served in jail.

"Q   That was despite his statement that he did not own this car, and that he did not have a Driver's License?

"A   Yes, that is correct."

In July, 1976, a criminal defendant was in custody as a result of a bench warrant. His counsel and the district attorney agreed on a guilty plea and appeared in Judge Field's courtroom. The following transpired, according to defendant's counsel:

"So it was about 9:30 [July 14], I would say, maybe 10:00 o'clock, perhaps a few minutes later but not too much later, I went to Judge Field's courtroom and waited until she had finished her docket which was around 11:15 or 11:30, to the best of my recollection.

"Then I approached the bench and I told her my client was in jail and that I represented Ronald Carter and he had been placed in jail and was upstairs, and I asked her if she would take a Guilty plea since he was here and since I was in the courtroom and since the District Attorney was willing to accept a plea at that time.

"And she told me that she would not accept a Guilty plea at that time but that the case would be placed down

[ 631 ]

on the docket for July 19th, Monday, July 19th, at which time she would take a Guilty plea.

"And I told her that I was practicing in Woodburn and that it would be very inconvenient for me to come back and I'd appreciate it if she would take the pleas on the 14th while I was there and while everybody else was there.

"And she told me, 'Mr. McCann, I told you I was going to take this plea on Monday. Now don't push your luck.' And I did push my luck. I said, 'Well, Your Honor, if you can't take it this morning, I would be willing to stay around until this afternoon if you would take it this afternoon because Mr. Carter is here and I'm here and the District Attorney is here and we are all ready to go now and this will only take about ten minutes.'

"And I said, 'If you don't take it today, it will mean my client will have to stay in jail for five days.'

"And she said, 'Well, Mr. McCann, it couldn't happen to a nicer guy. I only wish I could put you in jail along with him. Unfortunately, we can't jail the attorney.' "

A police officer testified that in February, 1977, he appeared in court in relation to a DUII citation. The defendant's name was called but he was not present. Without swearing the witness, the judge asked the officer for the breathalyzer reading, and he responded, "1.8." She found the defendant guilty and fined him $250. Although no evidence was offered by anyone, she also found the defendant guilty of no operator's license and fined him $15.

In May, 1977, Judge Field revoked a defendant's probation without his attorney being present, although she had been advised that he had counsel. When the defendant told her he had counsel who was not present, she stated, "We are going to talk about you, not an attorney or anybody else."

A deputy district attorney testified that during 1976 Judge Field would not appoint an attorney when the defendant had agreed to have the case heard by the court without a jury. In one instance, a woman

[ 632 ]

charged with prostitution requested counsel be appointed. She was advised that her request was "too late." At the time of trial she appeared with her mother; both advised the court they were without funds and again requested counsel. The deputy district attorney told the court an attorney should be appointed. The request was denied and defendant was found guilty and sentenced to 30 days. At neither time did the judge inquire concerning the defendant's financial situation or her ability to hire an attorney.[3]

As a district court judge handling misdemeanors, Judge Field was closely involved with the Metropolitan Public Defender's Office. The Public Defender, who was concerned about the manner in which defendants were being advised of their rights by the court, requested a meeting of the judge, a deputy district attorney, and himself. At the meeting on February 11, 1976, he testified that "she seemed not to center on what we were talking about * * *" and would not listen to or comprehend the problem. She felt the "people in the MPD were saying bad things about her, malicious rumors" and that her "primary job was to keep the court running quickly."

The relations between the Public Defender's Office and the court continued to deteriorate. As a result, private counsel received more appointments, and defendants would enter not guilty pleas before her and then change the pleas to guilty before another district judge. There was evidence that a large number of attorneys were filing affidavits of prejudice against Judge Field. One of the district judges testified that over 400 affidavits were filed against Judge Field in a year, compared to approximately 10 against any other district judge.[4] As a result, when cases were assigned,

---

[3]There were other cases where it appeared obvious that the defendant qualified for court-appointed counsel. Judge Field, in her answer to the charges, stated the volume of cases prevented her from doing as thorough a job of determining indigency as she would like.

[4]We do not intend to imply that the number of affidavits necessarily has any bearing on a judge's ability. There may be other reasons for the filing of affidavits.

it was necessary to assign them to other judges, greatly increasing those judges' individual caseloads. The judge also stated that on several occasions he would observe Judge Field in an extremely distraught condition and crying. At another time, she refused to follow the district court practice of rotating courts every six months when the duties change. She refused to move her furniture out of her chambers and even locked the door, resulting in one judge having no chambers until the presiding judge convinced her to move her furniture. He testified that, while Judge Field was well educated and not lacking in intelligence, her problem was "her temperament and apparent inability to get along with people and the lawyers before the court." He reluctantly stated that, in his opinion, she was not competent to perform as a district court judge for Multnomah County.

In all fairness to Judge Field, we find that some of the charges are inconsequential or the result of oversight, and others contain criticisms that could be addressed to any trial judge.[5]

However, the evidence clearly shows a general incompetent performance of judicial duties. Her treatment of counsel, her disregard for statutory and constitutional rights of defendants, and her general inability to cope with the pressures of the office reflect a lack of the knowledge and judgment necessary for the proper administration of justice in our courts.

We also feel that her incompetent performance on the district bench was the result of emotional instability caused by the pressures of her duties.[6]

---

[5] As examples, there was evidence that Judge Field required lawyers to argue objections before the jury, failed once to swear the bailiff, required exceptions to be taken before the jury, and made the wrong decision on the merits of a case.

[6] Certain medical records relating to Judge Field were subpoenaed but were sealed and not introduced into the record when she objected on the grounds they were subject to the doctor-patient privilege contained in ORS 44.040. The Commission requests this court to pass upon the admissibility of the records. The matter has not been briefed by either side, and we decline the invitation to decide whether any exception may exist to the privilege. The records remain sealed.

[ 634 ]

■ The Commission has recommended that we remove Judge Field. Removal is not the only solution available in cases of this kind. The 1976 amendments to the Constitution specifically provide for alternative sanctions for violations of the constitutional provisions. Whether removal is the appropriate solution depends not only on the magnitude of the violation but also on the probability of the violation's recurrence. If the violation is likely to recur, removal is appropriate.

Judge Field did not testify before the Commission. However, portions of her deposition were read into the record. She stated that after she finished her "tour of duty" in the traffic court in the winter of 1974-75, she received psychiatric treatment at the University of Oregon Medical School. She stated that the volume in the traffic court had been extremely heavy for those six months. She also stated:

> "What happened in traffic court was one morning in—it was in December, towards the end of December, I went into the courtroom and I couldn't remember my opening statement that I made four times a day for six months. All of a sudden I couldn't remember it and I got frightened by it. I came back to my chambers; someone said 'write it out.' I couldn't write it out. I just went blank. I told my secretary to take me to the Medical School."

Again, in January, 1977, she was hospitalized and received psychiatric treatment for two and a half or three weeks. She testified in her deposition:

> "Q  I see. What happened to you as far as your own observations? What happened to you physically or mentally or whatever?
> "A  I blew my stack. I just wasn't thinking properly.
> "Q  I mean, when you say 'blew your stack,' how would it manifest itself?
> "A  I just wasn't thinking properly.
> "Q  I mean, did you do things that you otherwise might not have done?
> "A  I had thoughts that—I didn't do anything that I might not have done, but I had thoughts about things I shouldn't have had thoughts about. They weren't real.

"Q Can you describe that better for me?

"A No, I can't.

"Q I see. But they were sort of out of reality; is that what you're saying?

"A I was overloaded."

She also explained the reason for her emotional problems:

"Q Can you tell me what led up to the sick leave or what—

"A Yes. The constant pressures I've had, the stresses I've had by the Judicial Fitness Commission, the pressure on me for everything I've done, and the accumulative affidavits of prejudice; that was a lot of pressure, plus the one year in the misdemeanor court where I heard over 6,000 cases and had to sentence *hundreds of people*—

"Q Uh-huh.

"A —and that was just a very exhausting experience.

"Q I see. Well, now, taking these one by one that you have mentioned, taking first the Commission's pressure, could you describe that to me?

"A Yes. From the very beginning that I've become a Judge, I've gotten those certified return receipt letters, love letters, from the Commission, repeatedly. And a number of the files, when I specifically asked for cases, citations, and when I got them and checked the file out, it wasn't anything like the letters were.

"And then there were a lot of vague generalities about my behavior on the bench that weren't—so that's all and that was a constant thing. I started—I guess I got that first letter less than six months after I had been on the bench."

Her answer to the Commission's charges further explained the January, 1977, treatment:

"I was in Woodland Park Mental Health Center in January, 1977, precipitated, in part, by cumulative exhaustion due to one year tenure in Misdemeanor Court and the pressure of incessant scrutiny that your organization *has put on me ever since I have been a judge.* My doctor did not initiate an involuntary civil commitment procedure."

While we recognize the pressures upon a trial judge in a busy metropolitan court, we believe Judge Field's inability to cope with her emotional problems after several attempts with professional help indicates that removal is a necessity. It is appropriate that we mention here that the district courts of this state are, in reality, the "People's Courts," and for many it may be the only contact they will ever have with our courts. "The impressions they receive serve to shape their opinion of the judicial system, our laws and law enforcement. We cannot permit that opinion to be anything but one of confidence and respect." *Matter of Yengo,* 72 NJ 425, 371 A2d 41, 46 (1977), *quoting* Chief Justice Weintraub in 81 NJ L J.

It is the decision of this court that Judge Field shall be removed from office as District Court Judge for Multnomah County. The order for removal shall issue not sooner than 20 days after the date of this decision.[7]

---

[7] Rule 10.20 of this court provides that a petition for rehearing may be filed within 20 days after the date of this court's decision.

In the Matter of
THE HONORABLE SHIRLEY A. FIELD, *Judge.*
(SC 25453)

Shirley A. Field, *pro se,* and Margaretta M. Eakin and Leslie M. Roberts, for the petition.

PER CURIAM.

## PER CURIAM.

Judge Field has filed a petition for a rehearing and reconsideration of our decision in which we found that her performance as a district court judge was incompetent. We further found that Judge Field must be removed from office because her incompetency was the result of emotional instability which, over a period of time, she had been unable to overcome. In the petition she requests that this court or the Judicial Fitness Commission hear further evidence "regarding the effect of past emotional problems on future stability."[1]

One of the original charges made against Judge Field before the Commission was that she suffered from mental impairment which affected her judicial competency. At the hearing certain deposition testimony relating to her emotional condition was received in evidence. The question of her emotional stability was one of the issues. During the hearing, counsel for the Commission attempted to subpoena and introduce Judge Field's medical records from both Woodland Park Mental Health Center and the University of Oregon Health Sciences Center where she received treatment. Instead of meeting the issue of her present and future emotional condition and perhaps offering testimony to explain it, she vigorously objected to the introduction of her medical records on the grounds they were subject to the doctor-patient privilege contained in ORS 44.040. As a result, they were not received and have not been seen or considered by this court. It was Judge Field's decision that the records not be available for introduction and inspection.

The petition for rehearing is denied.

---

[1] The petition for rehearing also raises the issues of the failure of one or more of the members of the Commission to disqualify themselves, and the filing of an amended complaint on the morning of the hearing. These two matters were considered in the original opinion and upon reconsideration we adhere to our original opinion for the reasons stated therein.