# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #036

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of June, 2016**, are as follows:

**BY GUIDRY, J.**:

2016-O -0054      IN RE:  JUSTICE OF THE PEACE J. ROOSEVELT GREMILLION DISTRICT
                  SEVEN PARISH OF POINTE COUPEE STATE OF LOUISIANA

                  Accordingly, it is ordered, adjudged and decreed that respondent,
                  Justice of the Peace J. Roosevelt Gremillion, District Seven,
                  Parish of Pointe Coupee, State of Louisiana, be removed from
                  office and that his office be declared to be vacant. Furthermore,
                  the respondent is ordered pursuant to La. Sup.Ct. Rule 23, § 26,
                  to refrain from qualifying as a candidate for judicial office for
                  five years and until certified by this court as eligible to
                  become a candidate for judicial office. Finally, pursuant to La.
                  Sup.Ct. Rule 23, § 22, we cast the respondent with $1,547.43 for
                  the costs incurred in the investigation and prosecution of this
                  case. REMOVAL FROM JUDICIAL OFFICE ORDERED.

                  HUGHES, J., dissents in part with reasons.

# SUPREME COURT OF LOUISIANA

## No. 2016-O-0054

### IN RE: JUSTICE OF THE PEACE J. ROOSEVELT GREMILLION, DISTRICT SEVEN, PARISH OF POINTE COUPEE, STATE OF LOUISIANA

### JUDICIARY COMMISSION OF LOUISIANA

**Guidry, J.**

This matter comes before the court on recommendation of the Judiciary Commission of Louisiana that respondent, Justice of the Peace J. Roosevelt Gremillion, District Seven, Parish of Pointe Coupee, State of Louisiana, be removed from office and ordered to reimburse to the Judiciary Commission and the Office of Special Counsel the costs incurred in the investigation and prosecution of this case. After conducting an investigation, the Judiciary Commission filed a formal charge against Justice of the Peace Gremillion alleging that he violated Canons 1, 2A, 2B, 3A(1), 3A(4), and 3A(7) of the Code of Judicial Conduct and engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25 C (1974).[1]

---

[1] The relevant Canons provide in pertinent part:

**Canon 1**. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.

**Canon 2A**. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

**Canon 2B**. A judge shall not lend the prestige of judicial office to advance the private interest of the judge or others… .

**Canon 3A(1)**. A judge shall be faithful to the law and maintain professional competence in it.

**Canon 3A(4)**. A judge shall perform judicial duties without bias or prejudice.

More specifically, the formal charge alleged that Justice of the Peace Gremillion rendered a judgment without giving the defendants a meaningful opportunity to be heard, without requiring the plaintiff to present any evidence or sworn testimony, and without giving the defendants written notice of the judgment against them; displayed bias or prejudice throughout the proceedings in favor of the creditor and/or against the defendants' efforts to defend the claim against them; notarized power of attorney forms when the purported affiants did not appear before him, swear out an oath, or sign the forms in his presence; and used a notary stamp that gave the incorrect impression he is an attorney. After a thorough review of the facts and law in this matter, including the stipulations of material facts and conclusions of law entered into by the respondent and the Office of Special Counsel, we find clear and convincing evidence sufficient to support the charge filed against Justice of the Peace Gremillion. We agree with the Judiciary Commission's recommendation of discipline that Justice of the Peace Gremillion be removed from office and ordered to reimburse and pay to the Commission the amount of $1,547.43.

FACTS and PROCEDURAL HISTORY

Justice of the Peace Gremillion (hereinafter "respondent") and the Office of Special Counsel to the Judiciary Commission entered into a stipulation of facts, in which the respondent admitted the factual allegations contained in Formal Charge No. 0339. Respondent and the Office of Special Counsel also entered into stipulated conclusions of law, in which respondent stipulated that his conduct violated Canons 1, 2A, 2B, 3A(1), 3A(4), and 3A(7) of the Code of Judicial Conduct and Article V, Section 25(C) of the Louisiana Constitution.

---

**Canon 3A(7)**. A judge shall dispose of all judicial matters promptly, efficiently, and fairly.

2

Respondent was first elected to the office of Justice of the Peace, District 7, Parish of Pointe Coupee, in 2002, and he has served continuously since that time. Respondent is not an attorney at law. In addition to being an *ex officio* notary public by virtue of his position as a justice of the peace, respondent is a Louisiana licensed notary public, ID number 53791.

Respondent stipulated that he impermissibly rendered a monetary judgment against Sharon Smith and Joseph Smith, without holding a hearing or giving the Smiths a meaningful opportunity to be heard. More specifically, in 2011, LenCo Finance of New Roads ("LenCo") filed a collection suit in respondent's court against the Smiths, seeking the balance due on two promissory notes. On August 4, 2011, respondent issued and caused to be served a citation and statement of claim to Mr. and Mrs. Smith. The Smiths were served, and shortly thereafter, Mrs. Smith visited respondent's office and advised him that she had an attorney and wished to have a hearing on LenCo's claim. Mrs. Smith was upset and clearly was contesting LenCo's claim.

Respondent did not issue a written notice of trial but informed Mrs. Smith that a hearing would be held on August 11, 2011. Sometime before the scheduled hearing, an attorney called respondent and requested a continuance on Mrs. Smith's behalf. Respondent continued the hearing, but told the attorney to put the request for a continuance in writing, although written pleadings are not required in justice of the peace court.[2] After granting the continuance, respondent did not reset the matter for hearing or issue a written notice of trial. On August 13, 2011,

---

[2] La. Code Civ. P. art. 4917(A) provides: "A party or his attorney may state the claim, exceptions, defenses, or other pleas orally to the justice of the peace or the clerk of court. No written pleadings shall be required."

within ten days of service of citation, Mrs. Smith filed a written answer to LenCo's suit, stating: "I do not owe the plaintiff any part of what he claims."[3]

On August 16, 2011, the manager of LenCo presented respondent with the promissory notes signed by the Smiths and documents reflecting how much the Smiths owed on their loans. Without conducting a hearing and without requiring LenCo to present any evidence or sworn testimony, respondent then rendered a judgment against Mr. and Mrs. Smith for the sum of $1,232.58 in principal, plus $2,704.32 in accumulated interest. The LenCo manager's statements to respondent, however, were not made under oath, nor was prima facie proof submitted by sworn affidavit.[4] The judgment stated the defendant "filed his Confession of Judgment, wherein he authorized and consented that judgment be entered in favor of the plaintiff," despite the fact that respondent knew Mrs. Smith contested the claim and wanted a hearing. Moreover, the Smiths had been paying on their loans for a number of years, and Mrs. Smith had receipts showing some of their payments. When respondent rendered the judgment in favor of LenCo and against the Smiths, he did not give the Smiths an opportunity to present their documentary evidence and testimony in defense of the claim. Furthermore, respondent failed to give Mr. and Mrs. Smith written notice of the judgment against them, as required by La.

---

[3] Respondent's position is that he did not receive Mrs. Smith's answer. Nevertheless, written pleadings are not required in justice of the peace court, and respondent knew Mrs. Smith was contesting the claim and wanted a hearing.

[4] La. Code Civ. P. art. 4921(B), relative to default judgments, provides in pertinent part: "The plaintiff may obtain a final judgment only by producing relevant and competent evidence which establishes a prima facie case. When the suit is for a sum due on an open account, promissory note, negotiable instrument, or other conventional obligation, prima facie proof may be submitted by affidavit...."

4

Code Civ. P. art. 4922.[5] Mrs. Smith did not receive a copy of the judgment until her vehicles were repossessed two months after the judgment was signed.

Respondent also stipulated that he improperly notarized power of attorney forms when the purported affiants, the Smiths, did not appear before him, swear out an oath, or sign the power of attorney forms in his presence. As the Commission noted, respondent notarized these forms as a private notary public rather than in his *ex officio* capacity.

Specifically, in October 2011, at the request of LenCo, respondent notarized power of attorney forms allegedly signed by either Mr. or Mrs. Smith, naming LenCo as his/her attorney-in-fact to exercise any rights as "owner" to three vehicles that served as collateral for the loans to the Smiths. None of the power of attorney forms had been signed in respondent's presence and the affiants were not present before him. LenCo used these forms to repossess the Smiths' vehicles in satisfaction of the judgment. At the time he notarized these documents, respondent stipulated, it was his routine practice to notarize power of attorney forms for LenCo allegedly executed by persons who had not appeared before him. Additionally, respondent's notary stamp improperly identified his notarial license number as "Roll Bar #53791," giving the incorrect impression that he was an attorney and a member of the bar.[6]

---

[5] La. Code Civ. P. art. 4922, relative to justice of the peace courts, provides: "Notice of the signing of any final judgment shall be given as required by Article 1913 …." La. Code Civ. P. art. 1913(A) provides: "Except as otherwise provided by law, notice of the signing of a final judgment … is required in all contested cases, and shall be mailed by the clerk of court to the counsel of record for each party, and to each party not represented by counsel."

[6] *See* La. R.S. 35:12(B), which states in pertinent part: "Every document notarized in this state shall bear the notary identification number assigned by the secretary of state, except that if the notary is an attorney licensed to practice law in this state, he may use his Louisiana state bar roll number in lieu of his notary identification number.…"

Respondent stipulated that his actions as set forth above constituted failures to follow clear and determined law about which there was no confusion or question. Respondent further stipulated that his judicial actions were egregious.

Respondent stipulated he was biased or prejudiced in favor of LenCo and/or biased or prejudiced against Mr. and Mrs. Smith's efforts to defend this claim. Respondent stipulated he lent the prestige of his judicial office to advance the private interests of himself or LenCo. In his sworn statement, respondent indicated he believed that if LenCo filed suit, then the Smiths must have failed to pay off their loans. Respondent's bias against the Smiths was exhibited by statements such as the following:

> The African American community need to take care of their financial affairs. They want me to do things that is impossible. They want me to make them right when they wrong. They will – this lady was absolutely wrong. She should have paid her bill, or she had the opportunity to go and sit down with these folks and come up with something that's reasonable to pay, to pay them back. They was not going to erase the balance.[7]

In his sworn statement, respondent made statements indicating he believed LenCo had the right to seize whatever property was named as collateral on a loan and acknowledging he improperly notarized documents to facilitate these seizures. Respondent stated:

> Sharon brought it upon herself the problems she had. Because when you go through the finance company, they in business to make money. If they see an opportunity to get collateral to back up the loan, they going to get it. They going to get you – they going to let you have the money. And in a lot of cases, they know in advance that it very likely you will not completely pay the loan off.

---

[7] The Commission noted in its recommendation that respondent and the Smiths are African American.

> And they know almost how long it going to be before
> they take your property. And they going to take it. …

Although respondent knew Mrs. Smith was contesting LenCo's claim, he entered a purported consent judgment against her and her husband, captioned "Confession of Judgment." In his sworn statement, when asked if Mrs. Smith consented to the judgment being entered against her, respondent exhibited bias by stating, "I would say she did. She didn't pay these folks. The time passed, so … I would say she did."

Respondent stipulated that, by his words and conduct, he had given Mrs. Smith the impression he was biased against her. Mrs. Smith expressed in her sworn statement that she believed respondent "acted as if, just because I was … black … and a woman, that I didn't know what was going on, and that he could get over, and I wouldn't take it no further after they took my vehicles."

*Disciplinary Proceedings*

The Commission opened a file in this matter after receiving a complaint from Mrs. Smith in April 2012.[8] After providing the requisite notice of investigation to respondent, the Commission authorized and filed Formal Charge No. 0339 in August 2014. The Formal Charge alleges that respondent rendered a judgment without giving the Smiths a meaningful opportunity to be heard, without requiring the plaintiff to present any evidence or sworn testimony, and without giving the Smiths written notice of the judgment against them; displayed bias and prejudice throughout the proceedings in favor of the creditor and/or against the Smiths' efforts to defend the claim against them; notarized power of attorney

---

[8] Mrs. Smith alleged that respondent improperly rendered a judgment against her and her husband without holding a hearing, failed to provide them with notice of the judgment, and notarized documents that appeared to bear her and her husband's signatures but were not signed by them. She also claimed that respondent improperly suggested that he is an attorney by using a "Roll Bar" number to identify himself on the documents he notarized.

7

forms when the purported affiants did not appear before him, swear out an oath, or sign the forms in his presence; and used a notary stamp that gave the incorrect impression that he is an attorney, all in violation of Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2B (a judge shall not lend the prestige of judicial office to advance the private interest of the judge or others), 3A(1) (a judge shall be faithful to the law and maintain professional competence in it), 3A(4) (a judge shall perform judicial duties without bias or prejudice; a judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice), and 3A(7) (a judge shall dispose of all judicial matters promptly, efficiently, and fairly) of the Code of Judicial Conduct. The Commission further alleged that respondent engaged in willful misconduct relating to his official duty, willful and persistent failure to perform his duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

As noted above, respondent and the Office of Special Counsel ("OSC") entered into a stipulation of facts, in which respondent admitted the underlying facts previously set forth. The Commission agreed to accept the parties' stipulations of fact and to dispense with the services of a hearing officer, subject to further questioning of respondent at a Commission meeting and the introduction into evidence of certain exhibits referenced in the stipulations. Respondent ultimately appeared before the Commission in April 2015, at which time the exhibits at issue were introduced into evidence by the OSC.

Also as noted above, respondent and the OSC entered into stipulated conclusions of law, in which respondent stipulated his conduct violated the Code of Judicial Conduct and La. Const. art. V, § 25(C), as charged. The parties also entered into a stipulated recommendation of discipline, in which respondent agreed the Commission should refer this case to this court with a recommendation that he be publicly censured and taxed with costs. The Commission deferred a decision as to whether to accept the stipulated conclusions of law or the stipulated recommendation of discipline pending further proceedings, including respondent's appearance before the Commission.

The Formal Charge and the stipulation between the parties also addressed prior misconduct by respondent, as follows: Respondent was previously cautioned by the Commission in File No. 10-7599, concerning his handling of a garnishment proceeding for LenCo. Respondent was previously admonished by the Commission in File No. 10-7767, concerning his failure to submit financial disclosure statements to the Louisiana Legislative Auditor.

The Commissioners made additional findings of fact based upon their questioning of respondent and examination of the evidence introduced pursuant to the stipulations. The Commission found the vast majority of the claims made in respondent's court are collection claims made by finance companies. Respondent testified LenCo files a few collection suits in his court every month, although he stated at his appearance before the Commission that the suits brought by LenCo make up a "very small" portion of the collection suits filed in his court. According to respondent, collection suits rarely go to a hearing because they are typically not contested. In fact, respondent testified the *Smith* case was the first contested collection case he has handled.

Respondent stipulated that he was biased or prejudiced in favor of LenCo and/or biased or prejudiced against Mr. and Mrs. Smith's efforts to defend the claim against them, and further stipulated to the conduct and specific statements evidencing such bias. Despite these stipulations, respondent asserted during his appearance before the Commission that his conduct in the *Smith* case "definitely was not about bias." He responded affirmatively when asked by a Commissioner whether he felt he treated both parties in the *Smith* case fairly, and maintained that he was not biased in favor of a party or against a party. The Commission found several statements made by respondent, however, reinforced the stipulation that he was biased or prejudiced in favor of LenCo and/or against the Smiths. Moreover, to the Commission, these statements reinforced that respondent holds a general, implicit bias in favor of finance companies and against African Americans.[9]

One member questioned respondent about his statement that members of the African American community wanted him to do things that were not possible or wanted him "to make them right" when they were wrong. Respondent stated that white persons appearing before him did not ask him to do things he could not do, even though he had testified the manager of LenCo was a white man who had asked him to improperly notarize the power of attorney forms allegedly signed by the Smiths when none of the forms were signed in respondent's presence and the affiants were not present before him.

Respondent further testified that this was not the first time someone had asked him to notarize documents without the affiant present before him, but it was

---

[9] The Commission understood the term "implicit bias" to mean the attitudes or stereotypes that affect an individual's understanding, actions, and decisions in an unconscious manner without awareness or conscious direction.

the first time he acquiesced to such a request. He could not articulate why he did so in this instance and not others, other than to say that he made a mistake.

At his appearance before the Commission, respondent also said that he made a mistake in rendering judgment against the Smiths, despite knowing the Smiths contested LenCo's claim and only five days after he agreed to continue the hearing on the matter at the request of the Smiths' attorney (and asked that such request be put in writing).

During his sworn statement, respondent gave the following reply when asked if he would accept a verbal answer from a defendant who had been sued in his court:

> I'm an African American. African American talk about
> all kind of crazy things at all times. So you don't know
> when they mean anything. You don't even know what –
> if they talk to you about certain thing this minute, the
> next minute they talk to you about something else.

In response to questioning from his attorney during his appearance before the Commission, respondent testified about his extensive involvement with the National Association for the Advancement of Colored People ("NAACP"): he is the local President of the NAACP chapter in New Roads; served as the first Vice President and as the Treasurer of the state NAACP; served as the District Vice President of the NAACP; organized the chapter in New Roads; and has been a member of the organization since approximately 1957.

At his appearance before the Commission, respondent asserted that the *Smith* case was the only case in which he improperly notarized a document without the affiant present before him. This testimony, however, directly conflicted with respondent's stipulation it was his "routine practice" to notarize power of attorney forms for LenCo that were allegedly executed by persons who had not appeared

before him. Moreover, respondent admitted he knew that it was improper for him to notarize a document in the absence of the affiant at the time he notarized the power of attorney forms purporting to bear the Smiths' signatures when they were not present before him.

Respondent also stipulated that his "notary stamp improperly identified his notarial license number as 'Roll Bar #53791,' giving the incorrect impression that he was an attorney and a member of the bar." At his appearance before the Commission, respondent explained that he purchased the impression device at an office supply store, and someone at the store put the words "Roll Bar" before his notary number without him asking that they do so. Respondent claimed that he purchased the impression device at some point prior to being elected as justice of the peace in 2002, that he ceased using the device once he discovered the use of the words "Roll Bar" created the impression he was an attorney, and that he probably used the device for only "a couple months." Respondent's testimony that he probably used the device for only a couple of months, however, conflicts with the fact that he used the stamp to notarize some of the documents in the *Smith* case in 2011, which occurred many years after respondent acquired the impression device prior to 2002. Respondent later admitted he might not have been made aware that the use of the words "Roll Bar" was improper until Mrs. Smith made her complaint against him in 2012.

During his appearance before the Commission, respondent admitted his notarizing of documents without the affiant present was a mistake and acknowledged he made other mistakes in the course of the *Smith* case; however, he struggled to articulate what those other mistakes entailed:

Q. Well, why would you say you made a mistake if you don't know what the mistake was?

A. Because I'm hearing at this hearing. I'm hearing it. I'm hearing that you said – or maybe someone said that maybe you shouldn't have notarized this power of attorney in the absence of the person who was making it. And you say it's a mistake. Okay. I'm agreeing. It's a mistake.

* * *

Q. [D]o you believe you made any mistakes other than notarizing the document with the people not present in the room?

A. I can't, you know – you know, in looking at the records and you having the – the legal know-how about the way the legal papers ought to be drawn, how it's done, maybe I did. I can't put my finger on them, but maybe I did. And any of them that I did, no – no harm meant to any person, to Ms. Smith or to LenCo, either one. I want to do it right. I made – I made some mistakes. I apologize for it.

At his sworn statement and during his appearance before the Commission, respondent emphasized that he is not a lawyer and has received only limited legal training.[10] He insisted he did the best he could with the information that is submitted to him and based on the training offered by the Attorney General each year. In response to questioning from a Commissioner, respondent testified regarding the steps he planned to take to ensure that he does not repeat the mistakes he made in the *Smith* case, including attending classes, referencing the manual supplied by the Attorney General, consulting with the Attorney General's staff, and, with the assistance of his attorney, preparing forms to be used in all his activities as a justice of the peace. Respondent acknowledged, however, that the only resources that are currently available to him that were not available to him at

_____

[10] During his sworn statement, respondent also testified that he never attended college.

the time of the *Smith* case are the forms prepared by him and his attorney, because in 2011 he had attended Attorney General training and already possessed the manual.

At the conclusion of his appearance before the Commission, respondent explained that it was a new experience for him, a learning experience, and that he apologized if he had caused any harm or anguish to Mrs. Smith. He stated that, going forward, he would be more careful in notarizing any documents and that he would seek outside assistance if he had any questions about his authority. He apologized for his actions and stated he would do the best that he can to prevent any reoccurrence. In his brief to the Commission, as he does in this court, respondent recognized that he failed to abide by the provisions of the Code of Judicial Conduct, but he maintained that his transgressions were neither willful nor the result of bad faith on his part, but were instead merely the result of ignorance. He acknowledged his transgression in the stipulations and is regretful for the harm caused to the Smiths and the judiciary. He asserted he recognizes the legal deficiencies of his acts and omissions and the requisites to avoid the repeat of such failures and transgressions in the future.

Following the proceedings in April 2015, the Commission filed its recommendation in this court on January 11, 2016. Ultimately, the Commission agreed respondent violated the Code of Judicial Conduct and the Louisiana Constitution as charged but disagreed with the parties that a public censure is the appropriate recommendation to the court in this case; rather, the Commission voted to recommend respondent be removed from office. The matter was then set on the court's docket for oral argument pursuant to Supreme Court Rule XXIII, § 14.

14

**LAW and DISCUSSION**

This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. 5, § 25(C), which provides:

> On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.

Pursuant to its supervisory authority over all lower courts, this court adopted the Code of Judicial Conduct, effective January 1, 1976, which supplements the Constitution's substantive grounds for disciplinary action against a judge. *See In re: Justice of the Peace Cook,* 05-0783 p. 5 (La. 6/29/05), 906 So. 2d 420, 424. The Code is binding on all judges, including justices of the peace. *Cook,* 05-0783 p. 5, 906 So. 2d at 424; *In re: Justice of the Peace Landry,* 01-0657 p. 11 (La. 6/29/01), 789 So. 2d 1271, 1278. Violations of the Canons of the Code of Judicial Conduct, without more, may serve as the basis for the disciplinary action provided for by La. Const. art. 5, § 25(C). *Cook,* 05-0783 p. 5, 906 So. 2d at 424.

In addition, a justice of the peace is governed by the same constitutions and laws that govern all courts and judges of this state, and is bound to apply the law as written by the legislature and construed by the various courts. *In re: Justice of the Peace Alfonso,* 07-0120 p. 7 (La. 5/22/07), 957 So. 2d 121, 125; *Cook,* 05-0783 p. 5, 906 So. 2d at 424. That a justice of the peace is untrained in the law does not

15

relieve a justice of the peace of the responsibility to follow the rule of law. *Alfonso,* 07-0120 p. 7, 957 So. 2d at 125; *Cook,* 05-0783 p. 5, 906 So. 2d at 424.

The charge against a judge must be proved by clear and convincing evidence before this court can impose discipline. *In re: Hunter,* 02-1975 p. 3 (La. 8/19/02), 823 So. 2d 325, 328. In the instant case, respondent has stipulated to the facts and that his conduct violated Canons 1, 2A, 2B, 3A(1), 3A(4), and 3A(7), as well as Art. V, Sect. 25(C) of the Louisiana Constitution. Therefore, the sole issue presented to this court is the appropriate measure of discipline. *In re: Broussard,* 05-0475 p. 4 (La. 4/22/05), 900 So. 2d 814, 817. In determining the appropriate sanction, we are mindful of the primary purpose of the Code of Judicial Conduct, which is to protect the public rather than simply to discipline judges. *In re: Marullo,* 96-2222 p. 6 (La. 4/8/97), 692 So. 2d 1019, 1023.

Respondent's violation of the rules of this court and the laws of this state has the potential to undermine the public confidence in the integrity of the judiciary. Our review of the record, including the stipulated facts and conclusions of law, shows that, in the *Smith* case, respondent denied the Smiths basic and fundamental due process rights guaranteed by the United States and Louisiana Constitutions. Despite the fact that he knew the Smiths desired a hearing and contested the claim against them, respondent rendered a monetary judgment against the Smiths without holding a hearing or giving the Smiths a meaningful opportunity to be heard. He rendered a judgment only five days after continuing the hearing in the case and without resetting the matter for hearing. As the Commission found, the judgment rendered by respondent inexplicably states the defendant "filed his Confession Of Judgment, wherein he authorized and consented that judgment be entered in favor of the plaintiff," despite the fact that respondent knew the Smiths were contesting

16

the claim and wanted a hearing. Moreover, respondent rendered the judgment in favor of LenCo without requiring it to produce relevant and competent evidence establishing a prima facie case, contrary to La. Code Civ. P. art. 4921(B). Finally, respondent failed to give the Smiths written notice of the judgment against them, as required by La. Code Civ. P. art. 4922, which deprived them of the ability to seek appellate review of the judgment; they did not receive a copy of it until their vehicles were actually repossessed two months later.

In addition, as the Commission found and respondent stipulated, respondent improperly notarized power of attorney forms when the purported affiants, Mr. and Mrs. Smith, did not appear before him, swear out an oath, or sign the power of attorney forms in his presence. It was these forms that LenCo used to repossess Mr. and Mrs. Smith's vehicles after respondent issued the improper judgment against them. Despite his testimony at his appearance before the Commission that such improper notarization was limited to the *Smith* case, respondent stipulated to the fact that, at the time he notarized these documents, it was his "routine practice to notarize power of attorney forms allegedly executed by persons who had not appeared before him for Lenco Finance."

This court has recognized that "a judge may be found to have violated La. Const. Art. V, Sec. 25 by a legal ruling or action made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where this legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error." *In re: Quirk*, 97-1143 pp. 11-12 (La. 12/12/97), 705 So. 2d 172, 180-181. The court further stated in *Quirk* that "[a] single instance of serious, egregious legal error, particularly one involving the

17

denial to individuals of their basic or fundamental rights, may amount to judicial misconduct." *Id.*, 97-1134 p. 8, 705 So. 2d at 178.

Respondent stipulated that his actions "constituted failures to follow clear and determined law about which there was no confusion or question" and that these "judicial actions were egregious." We agree with the Commission that respondent's actions in this matter strike at the heart of a defendant's fundamental due process rights. Both the United States and Louisiana Constitutions guarantee an individual the right to due process of law. La. Const. art. 1, § 2. The right to due process is one of the most basic and fundamental rights bestowed on our citizens by the Constitution. *Landry*, 01-0657 p. 9, 789 So. 2d at 1277. We agree with the Commission that respondent's egregious legal errors rose to the level of judicial misconduct under *Quirk*.

The Commission was deeply troubled that the record evidence suggests respondent harbors an implicit bias in favor of creditors and against African Americans, which appears to have contributed to his failure to afford the Smiths their due process rights and his willingness to improperly notarize documents for LenCo. Although he contested any suggestion of bias at his appearance before the Commission, respondent had stipulated that he was "biased or prejudiced in favor of Lenco Finance and/or biased or prejudiced against Mr. and Ms. Smith's efforts to defend th[e] claim [against them]" and had further stipulated to the conduct and specific statements evidencing such bias. Respondent's own testimony at his appearance before the Commission caused the members to conclude that he also harbors an implicit bias in favor of creditors and against African Americans, which impacted his handling of the *Smith* case. As disconcerting as that suggestion is in this day and age, this implicit bias was alluded to by Mrs. Smith in her sworn

18

statement when she testified that she believed respondent acted as if she "didn't know what was going on" merely because she is an African American woman, "and that he could get over, and I wouldn't take it no further after they took my vehicles."

Respondent further stipulated that he "lent the prestige of his judicial office to advance the private interest of himself or Lenco Finance." Respondent testified that his docket consists almost exclusively of collection suits brought by finance companies and that LenCo files a few collection suits in his court every month. The Commission found, and we agree, that by ruling in favor of LenCo in the *Smith* case, which he knew was contested, without conducting a hearing and following the proper procedures, and by improperly notarizing documents for LenCo, respondent lent the prestige of his office to advance the private interest of a litigant who appeared before him.

Respondent also used for a number of years a notary impression device that identified his notarial license number as "Roll Bar #53791," which gave the incorrect impression that he was an attorney and a member of the bar. Although respondent testified before the Commission that he did not request this wording be placed on the device and that he stopped using the device once he discovered it gave the impression he was an attorney, he had used the device for a number of years without appearing to question what "Roll Bar #" meant or why the office supply store included it on his notary device.

Based on respondent's commission of numerous egregious legal errors in the *Smith* case, which resulted in denying the Smiths their fundamental due process rights; his bias and prejudice in favor of LenCo and against the Smiths' efforts to defend the claim against them; his routine practice of improperly notarizing power

19

of attorney forms for LenCo allegedly executed by persons who had not appeared before him; and his use of a notary device that gave the incorrect impression that he was an attorney, we find by clear and convincing evidence that respondent violated Canons 1, 2A, 2B, 3A(1), 3A(4), and 3A(7) of the Code of Judicial Conduct, as charged in the Formal Charge. Moreover, given the seriousness of the misconduct at issue, the persistent nature of his errors and bias in the *Smith* case, his repeated improper notarization of power of attorney forms and use of a notary device giving the incorrect impression that he is an attorney, and given that much of his misconduct was committed publicly, we further find by clear and convincing evidence that respondent violated La. Const. art. V, § 25(C) as charged.

This court has held that a judge's conduct need not be intentional to support judicial discipline. *See Alfonso*, 07-0120 p. 7, 957 So. 2d at 125; *In re: Elloie*, 05-1499 p. 30 (La. 1/19/06), 921 So. 2d 882, 902. Consequently, respondent's assurances that his actions were not deliberate, intentional, or meant to hurt anyone do not preclude a finding of ethical misconduct sufficient to warrant a recommendation of discipline. As the Commission found, respondent's lack of education and lack of legal training do not present sufficient justifications for his actions, because the Code is binding on all judges, including justices of the peace. *Landry*, 01-0657 p. 11, 789 So. 2d at 1278. "[A] Justice of the Peace is governed by the same constitutions and laws that govern all courts and judges of this state, and is bound to apply the law as written by the legislature and construed by the various courts. That a justice of the peace is untrained in the law does not relieve a justice of the peace of the responsibility to follow the rule of law." *In re: Franklin*, 07-1425 p. 14 (La. 11/27/07), 969 So. 2d 591, 600 (internal citations omitted). Accordingly, we find that respondent's conduct exceeded mere judicial error and

rose to the level of judicial misconduct that is sanctionable. *Quirk*, 97-1143 (La. 12/12/97), 705 So. 2d 172.

*SANCTION*

The sanction recommended by the Commission for respondent is removal from his judicial office. When removal from office is considered as an appropriate sanction, this court has explained:

> The most severe discipline should be reserved for judges who … because of laziness or indifference fail to perform their judicial duties to the best of their ability;….

*In re Whitaker*, 463 So.2d 1291, 1303 (La. 1985).

This court in *Hunter, supra*, determined the judge in that case had failed to perform her administrative duties and supervise her staff, regardless of whether her failure resulted from inexperience, negligence, pride, or ineptitude. We explained:

> Especially in cases where incompetence is at issue, the proper focus in deciding "whether removal is the appropriate solution depends not only on the magnitude of the violation but also on the probability of the violation's recurrence. If the violation is likely to recur, removal is appropriate." *Matter of Field*, 281 Ore. 623, 635, 576 P.2d 348, 354 (1978); *see also In re Baber*, 847 S.W.2d 800, 803 (Mo. 1993)("[W]hen incompetency is alleged the court's task is to determine whether the conduct at issue establishes that the respondent lacks the requisite ability, knowledge, judgment, or diligence to consistently and capably discharge the duties of office he or she holds."). Applying this approach, we conclude that the consequences of Judge Hunter's conduct, both past and future, are too grave, and the likelihood of recurring harm to the justice system and the public is too great, should she remain on the bench.

*Hunter*, 02-1975 pp. 16-17, 823 So. 2d at 336. As in *Hunter*, we find the respondent may have been too incompetent or too indifferent to adequately perform his judicial duties. As did the Commission, we find it of great concern that respondent seemed to be unaware of the mistakes he had made. While we are

21

mindful that justices of the peace need not be lawyers, they must nonetheless be sufficiently competent to perform their important judicial functions. Moreover, as the Commission found, respondent's implicit bias against African American litigants appearing before him, and the lack of any indication that he could ameliorate such bias, seriously undermines confidence in the judiciary and in particular respondent's ability to perform his duties fairly and impartially. We thus agree that the consequences of respondent's misconduct are simply too grave and the likelihood of recurring harm is too great to permit him to remain a justice of the peace.

In recommending discipline, the Commission also looked to the factors set forth by this court in *In re: Chaisson*, 549 So. 2d 259, 266 (La. 1989),[11] and concluded as follows:

(a) and (b) Although the majority of respondent's misconduct occurred during the course of a single underlying case, the Commission could not characterize his misconduct as an isolated instance. Moreover, the Commission viewed his misconduct as being extremely serious and disconcerting.

---

[11] In *Chaisson,* this court, citing *Matter of Deming*, 108 Wash. 2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

> (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

The Commission found, and respondent stipulated, that he committed several egregious legal errors during the *Smith* case and exhibited bias and prejudice throughout that case, culminating in the deprivation of the Smiths' basic due process rights. The Commission found respondent's conduct throughout the *Smith* case and his testimony during his sworn statement and before the Commission indicated that he harbored an implicit bias in favor of creditors and against African Americans that likely pervades his handling of the numerous collection matters that come before his court. In addition, the Commission found, respondent's conduct and testimony indicated that he either lacked a fundamental understanding of basic procedural due process rights or intentionally disregarded such rights in *Smith*.

Furthermore, the Commission found, respondent routinely improperly notarized power of attorney forms for LenCo when the affiants did not appear before him, and he used a notary device that gave the incorrect impression that he is an attorney. Although he initially said he used that device for only a couple of months, the Commission found his testimony reflected that he had used it for a number of years.

(c) and (d) The Commission next found much of respondent's misconduct had occurred while he was acting in his official capacity as a justice of the peace, but some of it did not occur in the courtroom. His improper notarization of documents for LenCo and his use of a notary device which gave the incorrect impression that he is an attorney did not occur in his capacity as a justice of the peace, but occurred in his capacity as a fully commissioned notary public. However, as the Commission noted, his actions as a notary in the *Smith* case related to a case pending before him.

23

(e) and (f) As the Commission noted, respondent fully cooperated with the OSC during the investigation of this matter and following the issuance of the formal charge. He stipulated to substantially all of the factual allegations of the formal charge, stipulated that his actions constitute ethical misconduct in violation of the Code of Judicial Conduct and Louisiana Constitution, and stipulated that his conduct warrants a referral to the Supreme Court for the imposition of discipline.

However, during the course of his appearance before the Commission, the Commission found respondent gave testimony that contradicted the stipulated material facts in several instances. For instance, at his appearance before the Commission, he denied that he was biased or prejudiced in the *Smith* case, although he had previously stipulated that he was indeed biased and/or prejudiced. Likewise, at his appearance before the Commission, he testified that his improper notarization of documents without the affiant present before him was limited to the *Smith* case, despite his stipulation that it was his "routine practice" to improperly notarize power of attorney forms for LenCo. The Commission regarded respondent's testimony, which conflicted with his stipulations, to be less than candid and an attempt by him to mitigate the seriousness of his conduct.

The Commission also found that respondent's testimony before the Commission appeared to be less than candid in another respect. Respondent testified that he thought he only used the notary device with the words "Roll Bar #" on it for "a couple months." When questioned further, however, he acknowledged that he could have been using the notary device from sometime before 2002 until 2011.

Additionally, the Commission found that, although respondent stipulated to his misconduct and has stated that he is making efforts to avoid such misconduct in

the future, respondent could not actually articulate what he had done wrong in this matter, other than the improper notarization of documents. The Commission expressed serious doubts, and we agree, about respondent's ability to modify his conduct in the future when he does not appear to know what conduct it is that needs to be modified.

Moreover, the Commission found that respondent appears to harbor an implicit bias in favor of creditors and against African Americans, a bias which he does not appear to be cognizant of, as exemplified by his insistence that only African Americans, and never white people, asked him to do things that are improper, even though it was a Caucasian man from LenCo who had asked him to notarize documents that were not signed in his presence. It was unclear to the Commission how respondent intends to confront and address this implicit bias.

(g) As the Commission noted, respondent was elected to the office of Justice of the Peace, District Seven, Parish of Pointe Coupee, in 2002 and has served continuously in that capacity as of the date of this filing. Thus, at the time of his unethical conduct in this matter, he was an experienced judicial officer and should have been familiar with basic due process rights and his ethical obligations under the Code of Judicial Conduct and Louisiana Constitution.

(h) Respondent stipulated he has been involved in prior proceedings before the Commission. In June 2012, respondent was cautioned by the Commission in File No. 10-7599, concerning his handling of a garnishment proceeding for LenCo, in which he directly received garnishment proceeds in a garnishment-of-wages proceeding. Also in June 2012, respondent was admonished by the Commission in File No. 10-7767, concerning his failure to timely file mandatory sworn financial statements with the Louisiana Legislative Auditor for years 2007 and 2010.

25

(i) The Commission found that respondent's actions have harmed the integrity of and respect for the judiciary. In the *Smith* case, he exhibited bias and prejudice in favor of LenCo and against the Smiths, lent the prestige of his office to benefit the private interest of himself or LenCo, and, among other egregious errors, deprived the Smiths of their most basic right to be heard and defend the claim against them. Moreover, he had a routine practice of improperly notarizing power of attorney forms for LenCo when the affiant did not appear before him, and he used a notary device for a number of years that gave the incorrect impression that he was an attorney. In his brief to the Commission, respondent stated that he "recognizes and acknowledges that his failings in this matter created a lack of confidence and respect for the judiciary as a whole and understands that his misconduct has the potential to erode public confidence in the integrity of the judiciary."

(j) Respondent stipulated that he "lent the prestige of his judicial office to advance the private interest of himself or Lenco Finance." The *Smith* case, along with his routine practice of improperly notarizing documents for LenCo, demonstrated a willingness on his part to bend the rules in order to facilitate LenCo's collection efforts.

We agree with the Commission's conclusion that in light of the totality of respondent's misconduct, and in an effort to protect the public and the public's confidence in the judiciary, the appropriate sanction in this case is removal. In making the determination that the most severe sanction is necessary, we are guided by our prior precedents, which caution us:

> [R]emoval of a judge is a task we pursue cautiously, and only after painstaking evaluation and careful contemplation, remembering that the electorate can only be served by those who are faithful to the

26

solemn oath of office, the constitution, and the Canons of the Code of Judicial Conduct.

*In re: Hughes*, 03-3408 p. 61 (La. 4/22/04), 874 So. 2d 746, 788.

Consideration of the *Chaisson* factors found by the Commission supports our determination that removal is the appropriate sanction in this judicial discipline matter. As we reasoned in *Cook*,

> we find that the effect respondent's misconduct has had, or likely could have, upon the integrity of and respect for the judiciary is great. Our citizens who come before justices of the peace in this state expect and deserve a justice of the peace who is reasonably versed in the laws he or she will apply in deciding the matters before the justice of the peace court-matters that may in some instances be very minor in total dollar amounts, but which may very likely be critical to the parties. As set forth earlier, a justice of the peace is not required to be an attorney admitted to the practice of law; however, our law recognizes that justices of the peace, should be, at the very least, trained in the law as it pertains to their judicial authority, both civil and criminal.

*Id.*, 05-0783 p. 12, 906 So. 2d at 428.

We agree with the Commission that removal is warranted to protect the citizens who might come before respondent's court in the future and to protect and preserve the integrity and impartiality of the judiciary. Although he has served as a justice of the peace for approximately thirteen years, respondent either lacks a fundamental understanding of or intentionally disregarded basic procedural due process rights. Respondent also appears to harbor an implicit bias in favor of creditors and against African Americans, which likely impacted his handling of a case before him and contributed to his willingness to improperly notarize documents for a finance company. Given that respondent could not articulate at his appearance before the Commission the errors in this matter (other than improperly notarizing documents) and given that he does not appear to be cognizant of the existence of or the extent of his bias, we agree with the

27

Commission that we can place no confidence in respondent's ability to change or modify his conduct in the future and thus we believe there is too high a risk that individuals, especially any defendant in a collection matter and African Americans in any matter, can receive fair trials in his court. We agree with the Commission the record demonstrates that respondent cannot fulfill the primary and paramount purpose of a judicial officer in providing a fair and impartial forum in which the public may resolve their disputes.

CONCLUSION

Upon our review of the record, we conclude the most severe discipline is warranted in this case. Justice of the Peace Gremillion rendered a judgment without giving the defendants a meaningful opportunity to be heard, without requiring the plaintiff to present any evidence or sworn testimony, and without giving the defendants written notice of the judgment against them; displayed bias or prejudice throughout the proceedings in favor of the creditor and/or against the defendants' efforts to defend the claim against them; notarized power of attorney forms when the purported affiants did not appear before him, swear out an oath, or sign the forms in his presence; and used a notary stamp that gave the incorrect impression he is an attorney. Respondent's conduct thus constitutes a willful and persistent failure to perform his duty, willful misconduct relating to his official duty, and persistent, public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Accordingly, it is ordered, adjudged and decreed that respondent, Justice of the Peace J. Roosevelt Gremillion, District Seven, Parish of Pointe Coupee, State of Louisiana, be removed from office and that his office be declared to be vacant. Furthermore, the respondent is ordered pursuant to La. Sup. Ct. Rule 23, § 26, to refrain from qualifying as a candidate for

28

judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Finally, pursuant to La. Sup. Ct. Rule 23, § 22, we cast the respondent with $1,547.43 for the costs incurred in the investigation and prosecution of this case.

**REMOVAL FROM JUDICIAL OFFICE ORDERED.**

29

SUPREME COURT OF LOUISIANA

No. 2016-O-0054

IN RE:  JUSTICE OF THE PEACE J. ROOSEVELT GREMILLION,
DISTRICT SEVEN, PARISH OF POINTE COUPEE,
STATE OF LOUISIANA

JUDICIARY COMMISSION OF LOUISIANA


**Hughes, J., dissents in part.**


I respectfully dissent in part, and would impose a lesser sanction rather than the ultimate sanction of removal from office.